## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOSEPH MILISITS and, individually, and on behalf of a class of similarly situated individuals, | ) Civil Action No. |
| | ) |
| | ) Hon. |
| | ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** |
| | ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| FCA US LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## INTRODUCTION

1.      Plaintiff Joseph Milisits ("Plaintiff") brings this action for himself and on behalf of all persons in the United States and its territories who purchased or leased any Model Year 2016 or later FCA US LLC ("FCA" or "Defendant") vehicle equipped with FCA's 9-speed automatic transmission ("9HP Automatic Transmission") (collectively, "Class Vehicles")[1].

2.      FCA designed and marketed the Class Vehicles with the new 9HP Automatic Transmission as "a critical part of [its] strategy to meet fuel economy requirements,"[2] and promised that the new transmission would deliver "numerous

_____

[1] On information and belief, these vehicles include, but are not limited to, the following FCA models: 2016-2020 Jeep Cherokee, 2016-2020 Jeep Renegade, 2016-2017 Chrysler 200, 2016-2020 Promaster City, 2017-2020 Jeep Compass, 2017-2020 Chrysler Pacifica, and 2016-2020 Fiat 500X.

[2] See *Chrysler Group Plans to Invest Nearly $20 Million in Toledo Machining*

benefits customers will appreciate, including aggressive launches, smooth power delivery at highway speeds and improved fuel efficiency versus a six-speed automatic transmission."[3] Accordingly, FCA released the 2014 Jeep Cherokee with "the world's first nine-speed automatic transmission for a passenger vehicle,"[4] which FCA had previously lauded as a "leading-edge solution to […] mileage and emissions objectives."[5]

3.     The 9HP Automatic Transmission was supposed to serve as a significant technological advancement from previously employed six-speed automatic transmission, due to its unique 9:8 ratio spread and computer-controlled shifting, which were designed together to allow for better performance and fuel economy, while maintaining the ease of use of a traditional automatic transmission.

4.     However, prior to releasing the 9HP Automatic Transmission in its

---

*Plant,* FCA Corporate News (April 26, 2013), http://media.fcanorthamerica.com/newsrelease.do?id=14171&mid=18 (last visited June 12, 2020).  Exhibit 1

[3] See *All New 2014 Jeep Cherokee: No- compromise Mid-size SUV Sets a New Standard,* Press Kit: 2014 Jeep Cherokee, (Sept. 9, 2013)*,* http://media.fcanorthamerica.com/newsrelease.do?id=14039&mid=426 (last visited June 12, 2020) Exhibit 2

[4] See Danny King, *Jeep unveils 9-speed transmission for Cherokee*, AutoBlog.com (Mar. 28, 2013, 2:02 pm), http://www.autoblog.com/2013/03/28/jeep-unveils-9-speed-transmission-for-cherokee/ (last visited June 12, 2020). Exhibit 3

[5] See Evan McCausland, *Cloud 9: Chrysler Developing Nine-Speed Automatic for FWD Platforms,* automobilemag.com (Sept. 20, 2010) https://www.automobilemag.com/news/cloud-9-chrysler-developing-ninespeed-automatic-for-fwd-platforms-4448/ (last visited June 12, 2020). Exhibit 4

vehicles, FCA confirmed that the transmission was plagued with problems.

5.      The Cherokee's release, originally set for "no later than September" 2013[6], was plagued with delays due to glitches in "the software that controls how the SUV's nine-speed transmission interact[s] with its innovative disconnecting drivetrain."[7] Chrysler claimed that "[t]he company  will not ship vehicles until we are fully satisfied the Cherokee meets customer expectations for performance, refinement and quality."[8] "Insiders  say the new transmission – which is a ZF design but being built by Chrysler – isn't shifting as smoothly as intended."[9] Sergio Marchionne, CEO of Fiat Chrysler Automobiles, later admitted that the transmission lacked "mature" software at the time of release.[10]

---

[6] See *Jeep Cherokee still waiting on transmission fix: A transmission glitch is preventing shipments of Jeep's all-new Cherokee,* Left Lane News, (Oct.  11, 2013 1:08 pm), http://www.leftlanenews.com/jeep-cherokee-still-waiting-on-transmission-fix.html (last visited June 12, 2020), Exhibit 5

[7] See Larry P. Vellequette*, Chrysler CEO vows never to repeat mistakes from Cherokee launch,* Autoweek.com (Oct. 30, 2013), http://autoweek.com/article/car-news/chrysler-ceo-vows-never-repeat-mistakes-cherokee-launch (last visited June 12, 2020). Exhibit 6

[8] See *Jeep Cherokee still waiting on transmission fix: A transmission glitch is preventing shipments of Jeep's all-new Cherokee,* Left Lane News, (Oct.  11, 2013 1:08 pm), http://www.leftlanenews.com/jeep-cherokee-still-waiting-on-transmission-fix.html (last visited June 12, 2020), Exhibit 5

[9] *Id.*

[10] See Larry P Vellequette, *Another fix for Jeep's troubled 9-speed: Software upgrades come after consumer complaints pile up*, Automotive News (Feb. 2, 2015, 12:01 am) http://www.autonews.com/article/20150202/OEM01/302029930/another-fix-for-jeeps-troubled-9-speed (last visited June 12, 2020). Exhibit 7

6.     On September 24, 2013, it was reported that, in addition to having not shipped Cherokees equipped with the new 9-speed transmission, FCA "was also forced to postpone" media drive events to "further improve powertrain calibrations."[11]

7.     A similar pattern of lauded introduction followed by production delays also plagued other models, such as the Jeep Renegade.   First unveiled at the Geneva Motor Show in 2014, the 2015 Jeep Renegade featured the small SUV "segment's first nine-speed automatic transmission."[12]   This transmission was touted as highly advanced, to "afford luxury-car levels of shift refinement":

> To determine the appropriate shift mode, the transmission's software takes into account variables such as engine-torque gradients, kick-down events, longitudinal and lateral acceleration and grade changes. For improved driving comfort and refinement, the transmission control strategy closely monitors temperature, speed and electronic stability control activation.[13]

8.     Within months of its debut, FCA held back the Jeep Renegade "due to

---

[11] See *Chrysler Suspends Shift at Jeep Cherokee Plant: Chrysler is having an issue with its new Jeep Cherokee*, Left Lane News (September 24, 2013, 11:06 am), www.leftlanenews.com/chrysler-suspends-shift-at-jeep-cherokee-plant.html (last visited June 12, 2020). Exhibit 8
[12] See *Jeep introduces new Renegade small SUV; segment-first 9-speed transmissions,* Green Car Congress (March 4, 2014), https://www.greencarcongress.com/2014/03/20140304-renegade.html (last visited June 12, 2020). Exhibit 9
[13] *Id.*

undisclosed 'software problems.'"[14]  Marchionne said "the problem was similar to what delayed the 2014 Cherokee's launch."[15]  According to Car and Driver, there was reason to doubt FCA's denial that the delay was related to the 9HP Transmissions, "given Marchionne's comments."[16]  He told *Automotive News* that "I'm having a very bad engineering day.  It's a combination of attributes of that vehicle that is making my life horrible."[17]

9.     After multiple delays, attempted fixes and recalibrations, FCA nevertheless sold the Class Vehicles with the 9HP Automatic Transmission. Unfortunately for consumers, FCA knowingly rushed a product to market that it knew was defective.  FCA has been unable to repair the Class Vehicles.

10.    Ultimately, FCA failed to deliver any vehicles with the 9HP Automatic Transmission that lived up to the promise of a transmission that "shifts through the gears so smoothly that drivers don't even notice most of the gear changes."[18]

---

[14] See Clifford Atiyeh, *Jeep Renegade Held for Software Problems, May or May Not Be Related to 9-speed Auto*, Car and Driver (May 21, 2015), https://www.caranddriver.com/news/a15354981/jeep-renegade-held-for-software-problems-may-or-may-not-be-related-to-9-speed-auto/ (last visited June 12, 2019). Exhibit 10

[15] *Id.*

[16] *Id*.

[17] *Id*.

[18] See *Director Behind The Scenes 9HP* Drive: The ZF Magazine, Feb. 2013, at 29, https://www.zf.com/master/media/en/corporate/m_zf_com/company/download_center/vision/11860_1_54_vision_2_2013_online_deen.pdf (last visited June 12, 2020) Exhibit 11

11.    Traditional automatic transmissions use a set of gears that provide a given number of ratios.   The transmission shifts gears to provide the most appropriate ratio for a given situation.  Normally, that means lower gears for starting, middle gears for acceleration and passing, and higher gears for more fuel-efficient cruising. The 9HP Automatic Transmission differs from traditional automatic transmissions in that it employs a 9:8 ratio spread, as opposed to 6, allowing for shorter shifts between gears, keeping the engine speed as low as possible, and contributing to greater fuel efficiency. Additionally, the 9HP Automatic Transmission borrows fuel-efficient characteristics typically seen in manual transmissions, such as "dog clutches," which use less power to shift than the friction clutches normally utilized in automatic transmissions. However, in contrast to manual transmissions, the 9HP Automatic Transmission engages the dog clutches with computer software commands from an electronic control unit to save space and ensure that the complex transmission actually fits inside the vehicles. An automotive journalist best explains the result of employing the software:

> The 9HP's software on the other hand responds by cutting power initially, then diving as far down the gear-ladder as it can, engaging the dog clutches and then reinstating your throttle command. The result is a somewhat odd delay between the pedal on the floor and the car taking off like a bat out of hell.[19]

---

[19] See Alex L. Dykes, *ZF's 9-Speed 9HP Transmission Puts Dog Clutches On The Leash,* The Truth About Cars (Feb. 8, 2014), http://www.thetruthaboutcars.com/2014/02/zfs-9-speed-9hp-transmission-puts-dog-clutches-on-the-leash/ (last visited June 12, 2020). Exhibit 12

12.    Despite the initial skepticism towards the performance of the 9HP Automatic Transmission, Sergio Marchionne touted his confidence in the 9HP Automatic Transmission, stating that it "has all the elements that we feel are essential to our front-wheel-drive/all-wheel-drive portfolio"[20] and that "[i]t is still the most viable solution moving forward."[21] Further, FCA's press releases continued to praise the Cherokees' performance with the newly equipped 9-speed transmission:

> the all-new 2014 Jeep Cherokee completely redefines the mid-size SUV segment, delivering legendary Jeep 4x4 capability, a segment-first nine-speed automatic transmission, fuel economy improvements of more than 45 percent (versus the outgoing Liberty model), superior on-road ride and handling, a cutting-edge, revolutionary design, world-class craftsmanship, class-exclusive technology and more than 70 advanced safety and security features..[22]

And:

> The 2015 Jeep Cherokee premium on-road manners and fuel efficiency are a result of a number of efforts by Jeep engineers. Powered by the choice of two new engines mated to a segment-first nine-speed

---

[20] See Larry P. Vellequette, *Chrysler CEO vows never to repeat mistakes from Cherokee launch,* Autoweek.com (Oct. 30, 2013), http://autoweek.com/article/car-news/chrysler-ceo-vows-never-to-repeat-mistakes-cherokee-launch (last visited June 12, 2020). Exhibit 6

[21] See Larry P. Vellequette, *Marchionne commits to 9-speed, says technology keeps evolving*, Automotive News (Mar. 30, 2014 1:00 am), http://www.autonews.com/article/20140330/OEM06/303319976/marchionne-commits-to-9-speed-says-technology-keeps-evolving (last visited June 12, 2020). Exhibit 13

[22] See *All New 2014 Jeep Cherokee: No- compromise Mid-size SUV Sets a New Standard,* Press Kit: 2014 Jeep Cherokee, (Sept. 9, 2013), http://media.fcanorthamerica.com/newsrelease.do?id=14039&mid=426 (last visited June 12, 2020) Exhibit 2

automatic transmission, the all-new Cherokee delivers the power drivers appreciate on the road without sacrificing fuel efficiency. With highway fuel economy ratings of up to 31 mpg and a driving range on a tank of gasoline of nearly 500 miles, the all-new 2015 Jeep Cherokee delivers drivers a no-compromise ownership experience.[23]

13.     The performance of the 9HP Transmission in the 2015 Jeep Renegade was similarly described.  "Its fine-tuned 9.81 ratio spread between gears ensures quick takeoffs and consistently refined performance with exceptional efficiencies through all gears at all speeds."[24]  FCA continues to describe the performance of the 9HP Automatic Transmission in Jeep Renegades in this manner in subsequent brochures, such as the brochure for the 2018 Jeep Renegade.[25]

14.     A vehicle equipped with the 9HP Automatic Transmission should function in a manner that the driver expects, *i.e.* it should start, accelerate, decelerate, and stop at appropriate times while the driver operates the vehicle. In practice, however, FCA's 9-speed transmission operates erratically, causing numerous safety concerns.

---

[23] See *2015 Jeep Cherokee: Most Capable Mid-size SUV Expands Availability of Features Customers Desire for 2015*, Press Kit: 2015 Jeep Cherokee (Sept. 2, 2014), http://www.media.chrysler.com/newsrelease.do?&id=15865&mid=426 (last visited June 12, 2020). Exhibit 14
[24] See 2015 Jeep Renegade brochure, available at https://www.jeep.com/assets/pdf/renegade.pdf (last visited June 12, 2020) Exhibit 15
[25] See 2018 Jeep Renegade brochure, available at https://cdn.dealereprocess.org/cdn/brochures/jeep/2018-renegade.pdf (last visited June 12, 2020). Exhibit 16

15.     Specifically, Plaintiff is informed and believes, and based thereon alleges, that the 9HP Automatic Transmission contains a design and/or manufacturing defect that cause the Class Vehicles to exhibit rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; sudden loss of power; premature transmission wear; and transmission failure (the "Transmission Defect" or the "Defect").

16.     Based on information and belief acquired through publicly available information, Plaintiff believes that the Transmission Defect stems from the Transmission Control Module ("TCM") and its software.

17.     The Transmission Defect causes unsafe conditions, including, but not limited to, delayed acceleration, abrupt forward propulsion and sudden loss of power, which present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. As examples, these conditions may make it difficult to safely change lanes, make turns, merge into traffic, accelerate from stop light/sign, and accelerate onto highways/freeways.

18.     On information and belief, Defendant's corporate officers, directors, or managers knew about the Transmission Defect and failed to disclose it to Plaintiff and Class Members, including at the time of sale, lease, and repair.

19.     On information and belief, the Class Vehicles utilize the same or

substantially similar 9HP Automatic Transmission, and the Transmission Defect is the same for all Class Vehicles.

20.     On information and belief, the Transmission Defect also causes premature wear to the 9HP Automatic Transmission and other related components, which may result in premature transmission failure and require expensive repairs, including possible replacement of the transmission and its related components.

21.     As a result of the Transmission Defect, within the first 6 months of production, FCA issued several Technical Service Bulletins ("TSBs"), as well as three transmission software updates, to its dealers in the United States, acknowledging defects in the 9HP Automatic Transmission.

22.     However, consumer complaints persisted and FCA continued to issue numerous additional TSBs and transmission software updates through 2019. However, FCA's attempts to correct the Transmission Defect again fell short.

23.     On information and belief, consumers continue to experience the Transmission Defect in their vehicles despite the purported fixes, including, but not limited to: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; sudden loss of power; and premature transmission wear.

24.     The Transmission Defect presents a safety hazard because it can severely affect the driver's ability to control the car's speed, acceleration, and

deceleration. For example, these conditions make it difficult to safely change lanes, appropriately accelerate from a stop, merge into traffic, or make turns.

25.     Because FCA did not notify Class Members that the 9HP Automatic Transmission is defective, Plaintiff and Class Members purchased vehicles that are subjected to dangerous driving conditions that often occur without warning, and, because FCA has not subsequently notified Plaintiff and Class Members of the Defect or corrected the Defect, Plaintiff, Class Members, and members of the general public continue to be subjected to the dangerous conditions imposed by the Defect.

26.     The alleged Transmission Defect was inherent in each FCA vehicle equipped with the 9HP Automatic Transmission and was present in each FCA vehicle equipped with the 9HP Automatic transmission at the time of sale.

27.     FCA knew about Transmission Defect present in every Class Vehicle, along with the attendant dangerous safety problems, and concealed this information from Plaintiff and Class Members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Defect in the 9HP Automatic Transmission, FCA either refused to acknowledge the Defect's existence or performed repairs that simply masked the Defect.

28.     If Plaintiff and Class Members had known about the Defect at the time of sale or lease, Plaintiff and Class Members would not have purchased or leased the

Class Vehicles or would have paid less for them.

29.     As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

## THE PARTIES

### Plaintiff Joseph Milisits

30.     Plaintiff Joseph Milisits ("Milisits") is a citizen of Pennsylvania and resides in Vandergrift, Pennsylvania.

31.     In or around January 2019, Milisits purchased a new 2018 Jeep Renegade from #1 Cochran Chrysler Dodge Jeep Ram, an authorized FCA dealer in Natrona Heights, Pennsylvania. Milisits's vehicle was equipped with a 9HP Automatic Transmission.

32.     Milisits purchased his vehicle primarily for personal, family, or household use. FCA manufactured, distributed, advertised, marketed, and warranted the vehicle.

33.     Passenger safety and reliability were factors in Milisits's decision to purchase his vehicle. Milisits reviewed specific features and options for the Jeep

Renegade in the brochure with the FCA authorized dealer/salesperson and test drove a Jeep Renegade prior to his purchase. He also examined the window sticker on the vehicle prior to his purchase. Had FCA disclosed its knowledge of the Transmission Defect in its brochures or on the window sticker, Milisits would have seen such disclosures.

34.    FCA failed to disclose the Transmission Defect before Milisits purchased his vehicle and, in fact, concealed the Defect and misrepresented the performance of the transmission. FCA's omissions were material to a reasonable consumer. Like all members of the Class, Milisits would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Transmission Defect.

35.    In addition, at the time Milisits purchased his vehicle, and in purchasing the vehicle, Milisits, like all reasonable consumers, relied on representations from FCA and its authorized dealership that the vehicle was fully functional, safe, durable, and/or reliable. Milisits relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it.

36.    Within the first month of ownership of the vehicle, Milisits experienced problems with the vehicle's transmission. The vehicle would take a long time to shift, especially when going uphill, and he heard grinding noises from the

transmission.  He also experienced lurching and hesitation while driving his vehicle.

37.     With about 1,000 miles on the odometer, Milisits returned his vehicle to the FCA dealer in January 2019 and complained about the issues he experienced with the transmission.  He was told nothing was wrong with the vehicle and no repairs were performed.

38.     Milisits continued to experience the effects of the Transmission Defect and, during a routine oil change at the dealership, complained again.  The dealership kept his vehicle overnight, but again informed him that there was no problem with his vehicle.

39.     The service manager at the dealership informed Milisits that, because Milisits had not had a vehicle with a 9-speed transmission before, he simply did not understand how the transmission worked.

40.     Despite providing FCA and its authorized dealer with more than one opportunity to repair his vehicle, Milisits has continued to experience the Transmission Defect, including, but not limited to, rough, delayed, or sudden shifting, failure to shift, harsh engagement of gears, sudden or harsh accelerations, jerking, bucking, lurching and sudden loss of power, and hesitation, especially when the transmission is shifting between the fourth and fifth gears.  At all times, Milisits, like all Class Members, has attempted to drive his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

41.     Milisits and each other Class Member's ascertainable losses include, but are not limited to, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles and diminished value of the vehicles. Accordingly, Milisits brings claims individually and as a representative of the Class.

**Defendant**

42.     Defendant FCA US LLC is a limited liability company organized and in existence under the laws of the State of Delaware and registered to do business in the State of Pennsylvania as well as other states.   FCA US LLC's Corporate Headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA US LLC designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. FCA US LLC is the warrantor and distributor of the Class Vehicles in the United States. FCA US LLC's sole member is FCA North America Holdings LLC, a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V., which was incorporated as a public limited liability company (a "naamloze vennootschap") under the laws of the Netherlands. Its principal office is located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

## JURISDICTION

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is diversity because the plaintiff and the defendant are citizens of different states.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

44.     This Court also has personal jurisdiction over FCA because it maintains its principal place of business in this District.

## VENUE

45.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because this is a judicial district in which the defendant resides and in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

46.     FCA has designed, manufactured, distributed, sold, and leased the Class Vehicles. FCA has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles equipped with the 9HP Automatic Transmission in the United States.

47.     FCA designed and marketed the Class Vehicles with new 9HP Automatic Transmissions as "a critical part of [its] strategy to meet fuel economy

requirements,"[26] and promised that the new transmission would deliver "numerous benefits customers will appreciate, including aggressive launches, smooth power delivery at highway speeds and improved fuel efficiency versus a six-speed automatic transmission."[27]

48.    In fact, prior to even releasing the 9HP Automatic Transmission in its vehicles, FCA confirmed that the transmission was plagued with problems. FCA delayed releasing the transmission to the market and, on September 24, 2013, it was reported that FCA "was also forced to postpone" media drive events to "'further improve powertrain calibrations."[28]

49.    Unfortunately, FCA failed to deliver any vehicles with 9HP Automatic Transmissions that lived up to the promise of a transmission that "shifts through the gears so smoothly that drivers don't even notice most of the gear changes."[29] The

---

[26] See *Chrysler Group Plans to Invest Nearly $20 Million in Toledo Machining Plant,* FCA Corporate News (April 26, 2013),
http://media.fcanorthamerica.com/newsrelease.do?id=14171&mid=18
(last visited June 12, 2020).  Exhibit 1
[27] See *All New 2014 Jeep Cherokee: No- compromise Mid-size SUV Sets a New Standard,* Press Kit: 2014 Jeep Cherokee, (Sept. 9, 2013),
http://media.fcanorthamerica.com/newsrelease.do?id=14039&mid=426
 (last visited June 12, 2020) Exhibit 2
[28] See *Chrysler Suspends Shift at Jeep Cherokee Plant: Chrysler is having an issue with its new Jeep Cherokee*, Left Lane News (September 24, 2013, 11:06 am),
www.leftlanenews.com/chrysler-suspends-shift-at-jeep-cherokee-plant.html (last visited June 12, 2020). Exhibit 8
[29] See *Director Behind The Scenes 9HP* Drive: The ZF Magazine, Feb. 2013, at 29,
https://www.zf.com/master/media/en/corporate/m_zf_com/company/download_ce

Cherokee's release, originally set for "no later than September" 2013,[30] was plagued with delays due to glitches in "the software that controls how the SUV's nine-speed transmission interact[s] with its innovative disconnecting drivetrain."[31] Chrysler claimed that "[t]he company will not ship vehicles until we are fully satisfied the Cherokee meets customer expectations for performance, refinement and quality."[32] "Insiders say the new transmission which is a ZF design but being built by Chrysler – isn't shifting as smoothly as intended."[33] Sergio Marchionne, CEO of Fiat Chrysler Automobiles, later admitted that the transmission lacked "mature" software at the time of release.[34]

---

nter/vision/11860_1_54_vision_2_2013_online_deen.pdf (last visited June 12, 2020) Exhibit 11

[30] See *Jeep Cherokee still waiting on transmission fix: A transmission glitch is preventing shipments of Jeep's all-new Cherokee,* Left Lane News, (Oct.  11, 2013 1:08 pm), http://www.leftlanenews.com/jeep-cherokee-still-waiting-on-transmission-fix.html (last visited June 12, 2020), Exhibit 5

[31] See Larry P. Vellequette*, Chrysler CEO vows never to repeat mistakes from Cherokee launch,* Autoweek.com (Oct. 30, 2013), http://autoweek.com/article/car-news/chrysler-ceo-vows-never-repeat-mistakes-cherokee-launch (last visited June 12, 2020). Exhibit 6

[32] See *Jeep Cherokee still waiting on transmission fix: A transmission glitch is preventing shipments of Jeep's all-new Cherokee,* Left Lane News, (Oct.  11, 2013 1:08 pm), http://www.leftlanenews.com/jeep-cherokee-still-waiting-on-transmission-fix.html (last visited June 12, 2020), Exhibit 5

[33] *Id.*

[34] See Larry P Vellequette, *Another fix for Jeep's troubled 9-speed: Software upgrades come after consumer complaints pile up*, Automotive News (Feb. 2, 2015, 12:01 am) http://www.autonews.com/article/20150202/OEM01/302029930/another-fix-for-jeeps-troubled-9-speed (last visited June 12, 2020). Exhibit 7

50.     After multiple delays, attempted fixes and recalibrations, FCA nevertheless sold the Class Vehicles with the 9H Automatic Transmission. Unfortunately for consumers, FCA knowingly rushed a product to market that it knew was defective, and FCA has been unable to repair the Class Vehicles.

51.     In addition, beginning soon after release, through consumer complaints, dealership repair orders, and data regarding the FCA 9HP Automatic Transmission, among other internal sources, Defendant knew or should have known that the Class Vehicles and the 9HP Automatic Transmission contained the Transmission Defect that adversely affected the drivability of the Class Vehicles and caused safety hazards. Nevertheless, Defendant has actively concealed and failed to disclose this Defect to Plaintiff and Class Members at the time of purchase or lease and thereafter.

52.     On information and belief, Defendant's corporate officers, directors, or managers knew about the Transmission Defect and failed to disclose it to Plaintiff and Class Members, at the time of sale, lease, repair, and thereafter.

53.     A vehicle equipped with the 9HP Automatic Transmission should function in a manner that the driver expects, i.e. it should start, accelerate, decelerate, and stop at appropriate times while the driver operates the vehicle. In practice, however, FCA's 9-speed transmission behaves erratically, causing numerous safety concerns.

54.     Dating back to at least October 2013, FCA was aware of the Defect in

the 9HP Automatic Transmissions. FCA, however, failed and refused to disclose this known Defect to consumers.  As a result of this failure, Plaintiff and Class Members have been  damaged.

### The Transmission Defect Poses an Unreasonable Safety Hazard

55.    The Transmission Defect causes unsafe conditions in the Class Vehicles, including, but not limited to, the vehicles' inability to properly respond to driver input, such as acceleration and deceleration attempts, thereby rendering the driver unable to speed up or slow down appropriately while the vehicle is in motion. These conditions present a safety hazard, because they can severely affect the driver's ability to control the car's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely change lanes, appropriately accelerate from a stop, merge into traffic, or make turns.

56.    Complaints that Class Vehicles' owners and lessees filed with the National Highway Traffic Safety Administration ("NHTSA") demonstrate that the Defect is widespread and dangerous and that it manifests without warning.  The complaints also indicate Defendant's awareness of the problems with the transmission and how dangerous the Defect is for consumers. Listed below is just a sampling of the over 300 safety-related complaints that describe the Transmission Defect in Class Vehicles (http://www-odi.nhtsa.dot.gov/complaints/ (last visited June 15, 2020) (spelling and grammar mistakes remain as found in the original)):

**2016 JEEP CHEROKEE**

a.   On December 23, 2015, the following incident was reported as taking place on December 1, 2015: BRAND NEW CAR, SHAKE AND SHIMMY BETWEEN 1ST AND 2ND GEAR, AND HITS HARD IN 4TH. I HAVE ROUGHLY 1400 MILES ON IT. TOOK IT TO LOCAL JEEP DEALERSHIP FOR SERVICE, THE TEAM CLAIMED TO FIX IT WITH A TCM FLASH. HOWEVER, MUCH LIKE MANY OTHERS WHO HAVE HAD THE SAME ISSUE, THE FLASH DID NOT FIX THE ISSUE. EXTREMELY DISAPPOINTED IN JEEP'S ABILITY TO FIX THIS ACROSS 3 YEARS. THIS ISSUE HOLD THE GREATEST AMOUNT OF COMPLAINTS ACROSS 2014, 15, AND NOW 16 MODEL YEARS. LOOKING FORWARD TO EXERCISING MY STATES LEMON LAW.

b.   On February 3, 2016, the following incident was reported as taking place on January 30, 2016: VEHICLE SUDDENLY LOST ALL POWER TO TRANSMISSION WHILE TRAVELING DOWN ROAD. ENGINE REMAINED RUNNING BUT ALL ATTEMPTS TO GET TRANS. TO ENGAGE FAILED. LEFT US STRANDED IN A TRAVEL LANE ON HIGHWAY. POLICE

CALLED FOR SAFETY WHILE WAITING FOR ROAD SIDE TOWING. TOWED TO DEALER. DEALER HAS HAD VEHICLE FOR 5 DAYS NOW REPLACING MANY PARTS UNSUCCESSFULLY AND NOW SAYS PROBABLY NEEDS NEW TRANSMISSION. ITS ONLY 2 WEEKS OLD WITH 265 MI. THIS IS A FAULTY DANGEROUS VEHICLE! NOW I KNOW THIS PROBLEM IS COMMON AND THERE IS NO FIX. THIS VEHICLE SHOULD BE RECALLED . THE 9 SPD. AUTO TRANSMISSION DOES NOT WORK PROPERLY AND WILL GET PEOPLE HURT OR KILLED.

c.   On March 1, 2019, the following incident was reported as taking place that date: THE TRANSMISSION FAILED WHILE DRIVING 60MPH ON THE HIGHWAY. IT WOULD NOT ACCELERATE SO I HAD TO PULL OVER TO THE SIDE OF THE ROAD. I TURNED THE CAR OFF FOR A FEW MINUTES AND THEN RESTARTED IT. THIS SEEMED TO REBOOT THE SYSTEM AND I WAS ABLE TO DRIVE HOME. I TOOK THE CAR TO THE DEALER AND WAS TOLD IT WAS A "GLITCH" AND THE VEHICLE APPEARED TO BE WORKING PROPERLY TO THEM SO NO REPAIR WAS

22

DONE. A FEW MONTHS LATER IT HAPPENED AGAIN
EXCEPT TURNING IT OFF AND ON ONLY WORKED FOR A
FEW MILES BEFORE HAPPENING AGAIN. I TOOK IT BACK
TO THE DEALER AND THEY SAID IT WAS DUE TO A
SOFTWARE UPDATE. WHAT KIND OF CAR SHUTS DOWN
ON THE HIGHWAY DUE TO A SOFTWARE UPDATE!!! THIS
ISSUE PUT MY FAMILY IN EXTREMELY DANGEROUS
SITUATIONS AND JEEP REFUSES TO OWN UP TO HAVING
A FAULTY TRANSMISSION.

**2017 JEEP CHEROKEE**

d.  On March 8, 2017 the following incident was reported as taking
place on October 1, 2016: THE SO CALLED, 9 SPEED
TRANSMISSION ISN'T A 9 SPEED. IT NEVER, UNDER ANY
CIRCUMSTANCES, HITS 9TH GEAR. THE JEEP SERVICE
TECH TOLD ME THAT THERE'S NOTHING WRONG WITH
THE TRANSMISSION, BUT HE KNOWS THAT IT WILL
NEVER HIT 9TH. ALSO, I HAVE EXPERIENCED A VERY
SCARY MOMENT WHEN I SHIFTED FROM REVERSE TO
DRIVE. I STEPPED ON THE ACCELERATOR AND THE CAR
DIDN'T MOVE FOR A COUPLE OF SECONDS. I ALMOST

GOT HIT IN THE DOOR BY AN ONCOMING CAR! I HAVE BEEN GOING DOWN HILL AT OVER 70MPH, AND IT WON'T SHIFT TO 9TH. WHEN MOVING THE SHIFT LEVER FROM "D" TO THE ELECTRONIC MANUAL POSITION, THE INDICATOR SHOWS THAT 8TH IS THE HIGHEST ATTAINABLE GEAR. I CAN MANUALLY SHIFT THE HIGHEST ATTAINABLE GEAR TO 9TH, BUT THE TRANSMISSION STILL WON'T UP SHIFT TO 9TH GEAR.

e.   On September 25, 2017, the following incident was reported as taking place on September 23, 2017: 5 TIMES SINCE THE VEHICLE WAS PURCHASED ON 8-9-17 THE VEHICLE HAS COME TO A STOP FOLLOWING A STOP AT A STOP SIGN OR LIGHT. IT JERKS, STOPS AND PRESSING THE ACCELERATOR DOES NOTHING. I HAVE TO SHIFT INTO N, REEVE UP THE ENGINE, SHIFT BACK INTO D, BACK INTO N, AND RETURN TO D BEFORE I CAN MOVE AHEAD. IF THIS WOULD HAPPEN IN HEAVY TRAFFIC WITH A VEHICLE CLOSE BEHIND THERE WOULD BE AN ACCIDENT. I BELIEVE THIS IS A SERIOUS SAFETY HAZARD.

f.   On May 27, 2018, the following incident was reported as taking place on May 26, 2018: CAR STARTED HAVING SHIFTING ISSUES WHEN AT A HIGH RATE OF SPEED, HAD TO TAKE FOOT OF THE GAS FOR IT TO SHIFT. WENT FOR MY OIL CHANGE AND TALKED ABOUT THIS THEY INFORMED ME THAT CHRYSLER DID NOT WANT TO "RECALL" ALL THE VEHICLES SO THEY WERE JUST FIXING IT WITH A NEW COMPUTER CHIP. THEY SAID IF IT CONTINUES TO LET THEM KNOW. WELL, IT'S STILL DOING IT BUT NOW I AM HAVING ISSUES WITH THE CAR DINGING WHEN TURNING AS IF MY GAS LIGHT COMES ON BUT NOTHING APPEARS ON THE DASH BOARD. YESTERDAY I WENT AROUND A TURN IT DINGED BUT THEN ALSO A MESSAGE APPEAR SAYING SOMETHING ABOUT THE SHIFTER BEING PUT IN D. THE CAR HAD PRETTY MUCH DIED. TRIED RESTARTING IT WOULD JUST REV. THE BATTERY AND TRANSMISSION LIGHT APPEARED. WE WAITED A FEW MINUTES AND TRIED AGAIN IT FINALLY TURNED OVER. I DO ALL HIGHWAY DRIVING TO AND FROM WORK THIS IS THE LAST THING I NEED IS TO GET

INTO AN ACCIDENT BECAUSE THE VEHICLE FAILED. LAW SUIT *PURCHASED THIS CAR NEW IN APRIL 2017, HAS 31,000 HIGHWAY MILES ON IT.

**2016 CHRYSLER 200**

g.  On September 20, 2018, the following incident was reported as taking place that date: THE CAR BEGAN SHIFTING HARD AND HAD BEEN TAKEN TO THE DEALERSHIP TWICE FOR THAT ISSUE. THEY COMPLETED A SOFTWARE UPDATE WHICH DID NOT CORRECT THE ISSUE. TODAY, 09-20-2018, THE CAR WAS SHAKING VIOLENTLY WHEN TAKING OFF AND STOPPED MOVING. IT WAS THE SHIFTED TO PARK AND WOULD NOT GO BACK TO DRIVE. IT WAS THEN SHUT OFF AND RESTARTED AND THEN SHIFTED IN TO DRIVE. IT NOW SHAKES VIOLENTLY EVERY TIME WHEN TAKING OFF. IT IS SCHEDULED FOR SERVICE AGAIN FOR THE THIRD TIME. THERE IS ABOUT 42,000 MILES ON THE CAR. THE OTHER ISSUES OCCURRED WITHIN THE LAST MONTH.

h.  On October 3, 2016, the following incident was reported as taking place on October 1, 2016: VEHICLE LOST POWER WHILE

PULLING INTO TRAFFIC. 2016 CHRYSLER 200 S WITH 2614 MILES...ENGINE WAS WARM. I STEPPED ON THE GAS AND LOST ALL POWER (ELECTRICAL), FOLLOWED BY ENGINE STALL BEHAVIOR, POWER LOSS, STALL BEHAVIOR, THEN TRANSMISSION KNOB LIGHT FLASHES "D" AND INSTRUMENT CLUSTER SAYS TO SELECT GEAR AGAIN. WAS NEARLY REAR ENDED AND/OR T-BONED BY ONCOMING TRAFFIC. DEALER PERFORMED 4 FLASH UPDATES TODAY.

**2016 JEEP RENEGADE**

i.   On March 29, 2017, the following incident was reported as taking place that same date: TL* THE CONTACT OWNS A 2016 JEEP RENEGADE. WHILE DRIVING 10 MPH AND ATTEMPTING TO ACCELERATE, THE VEHICLE SHIFTED INTO NEUTRAL INDEPENDENTLY. THE VEHICLE WAS TAKEN TO THE DEALER TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE TRANSMISSION SOFTWARE NEEDED TO BE UPDATED. THE SOFTWARE UPDATE WAS PERFORMED; HOWEVER, THE FAILURE RECURRED TWICE. THE MANUFACTURER WAS NOTIFIED OF THE

FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 2,300.

57.    Also, complaints posted by consumers in Internet forums demonstrate that the Defect is widespread and dangerous and that it manifests without warning. The complaints also indicate Defendant's awareness of the problems with the transmission and how dangerous the Defect is for consumers. The following are safety complaints relating to the ZF 9HP Automatic Transmission Defect (spelling and grammar mistakes remain as found in the original)

- Edmunds.com, http://www.edmunds.com/, (last visited June 15, 2020),

- Cars.com, http://cars.com/ (last visited June 15, 2020), and

- CarComplaints.com, http://www.carcomplaints.com/ (last visited June 15, 2020)

a) **Edmunds.com 2016 Jeep Cherokee & 2017 Jeep Cherokee - Consumer Reviews:**

i.    joe skelly,02/01/2016 (2016 Jeep Cherokee): I guess we win. transmission crapped out after only 265mi. yes thats right 265! All the things everyone is saying about this vehicle are true. Run dont walk away from this. Luckily we were not on highway when it failed. Dont listen to dealer lies. They know about transmission problems and are not able to fix them. Gonna have to take a huge loss to get out

from this junk. Lemon law is our only hope. Update. Dealer couldn't figure out how to fix this vehicle. Luckily we got them to take it back from us for a minimal loss. I feel bad for the next person they sell this to! This 9 speed tranny is a joke.

ii.   DM Burnett, 11/27/2017 (2017 Jeep Cherokee): Since purchasing the vehicle in September 2016, it was seen in the service department in October 2016 for a loud click from the brake (told this is normal) and the vehicle shutting off during idle twice. An update was done but the issue continued. November 2016, I brought the vehicle in because the back seat would move back and forth if someone was not sitting in it (they had to replace the whole back seat) but as I was driving into the service doors the vehicle skipped and tried to die with lights flashing on the dash. Service could not duplicate. December 2016 brought in because the vehicle kept skipping when trying to take off from a stop. On two occasions it completely stalled but service was unable to duplicate. The vehicle also had issues with shifting too early at times and then shifting was delayed other times. Once again issue could not be duplicated. Later in December I brought it back again and was told there was a fix. January 2017 the vehicle was brought back again due to stalling and the multiair actuator was replaced. The issue continued as the service manager searched for an answer until I had enough in October 2017 when it came to a stop for no reason and the vehicle would make a terrible noise in

29

reverse at times. Service along with FCA attempted to fix it but could not duplicate the issue. When I received the vehicle back it now skips in idle, makes a lawn mower sound in idle and when shutting off make a whining noise. I have stopped driving the vehicle and am trying to get FCA to do the right thing via Georgia's Lemon Law. I have done my due diligence following FCAs required steps and they said they cannot duplicate my issue but would give me a good faith payment for my time. I have asked to talk to supervisors etc. but am told that is not their protocol. This vehicle is unsafe and should not be allowed on the road! I have video of the issues and one of the service agents commented on it having delayed shifting but FCA closed my case and said it is fixed, regardless of the fact you cannot fix an issue that cannot be duplicated. I sent my Lemon Law paperwork over 1 week ago certified mail and now USPS want to send it back because FCA hasn't come to pick it up. I will not drive my children around in the vehicle and I will never buy another Chrysler product. I love my dealership but FCA has no business making cars.

b) **Edmunds.com 2016 Jeep Renegade - Consumer Reviews:**

   i. Jenifer Rhodes,10/20/2016: DO NOT BUY!!!! I have had it into the dealer repeatedly and the issues are still not resolved. I have a rattle in the drive shaft that vibrates my whole car. It literally bogs down and vibrates until it decides

to shift. But this is apparently normal for a new Jeep Renegade. Moving onto the safety issue. While making a roll stop, when I go to push my gas pedal down to go, it simply does nothing but roll onto the road I am trying to turn on. Thank goodness I did not pull out in front of anyone because I would have been smashed. This has happened more than once and also to my husband that thought is was just my driving. But he had to eat his words when it happened to him. The dealer says its nothing but it should be a major concern since this could cause an accident. . . .

c) **Cars.com 2016 Jeep Renegade - Consumer Reviews:**

i. Dmac1221, 4/21/2018: Defect with brakes, less than 8,000 miles and have groves in front rotors. Fuel economy is horrible, my tundra full size truck had better gas mileage. Seats are stiff and uncomfortable. engine cuts out while driving down the road. Should not have this many problems with a new vehicle with less than 14,000 miles.

ii. Hannah, 6/19/2018: This was my first new car purchase and I am extremely disappointed in the Jeep Renegade. After owning the brand new car for only a year and a half, my car began to shut off as I was driving. A series of tests took place and it turned out that a new engine needed to put in. Again, a brand new car with only 27,000 miles on it. About a week later, the car began to do the same thing but no diagnosis was given. . . .

31

d) **CarComplaints.com 2016 Chrysler 200 & 2016 Jeep Renegade – Owner Comments:**

  i.  Donmo, November 8, 2016: I bought a new Chrysler 200 Limited in June 2016. My vehicle has less than 3,000 miles. I have experienced over 10 separate instances where my engine has stalled while decelerating at stop lights, stop signs, or street entrances and then trying to accelerate to get across traffic. The car stall/dies and has to be put back into park and then push the start button to restart. This is an extremely dangerous issue with my vehicle. I do not have any faith in my safety in driving this vehicle. Has anyone else had this same situation? If so, what did the dealer do to fix the situation. Thanks so much!

  ii.  Maryprice, January 24, 2017: I bought this Chrysler 200 in June 2016 and since then I have had issues with the battery (replaced) car would not start, battery would not hold charge and now this. While driving (in motion) the car just shuts off. I have been close to being rear ended due to this. This is my first Chrysler and I am beyond disappointed with this vehicle. On top of that when I take the car to the Service Dept of the dealership where I purchased the car they seem to know little to nothing about the issues of the car or how to resolve them.

  iii.  Andre C., August 6, 2018 (2016 Chrysler 200): The engine started stalling while driving. Especially when making a right or left turn, the car will shut off. I am not sure what is

the issue with this car. Nothing but trouble since I had it.

iv.  Bernadette G., June 19, 2017 (2016 Jeep Renegade): Again, the Renegade's engine stalled/cut out when making a right turn. This time I was across two lanes of traffic and nearly got killed again. My sub only has one entrance that right now is to a major road under major construction so the other drivers are not in good moods. Especially when I have to stop and restart the vehicle. The Vehicle is in "drive" and the message says to step on brake and push button to start. I am in drive already for crying out.  I could repeat this issue at least thirty times. Dealerships have not been able to fix the problem. One time they claimed to run in new software, but nothing changed. I was told that this had happened to another woman and they ended up giving her another Renegade. Service department was rude and not at all understanding that this problem has been on going and I need to have a replacement vehicle. Being told that I don't have that coverage (never offered to me). So I will have to drive an hour to the original Jeep dealership so I can get a temporary vehicle. Was told if I wasn't satisfied with the results to deal with Chrysler about it.

v.  D M, July 20, 2018 (2016 Jeep Renegade): I was in traffic flowing along on the highway at 70mph and it slowed to a crawl...stop and go at 5-10mph for about 15 minutes. Road dry, sunny, about 92 degrees F. I had the AC on and the radio full blast. I was pulling forward to crawl along and it

stalled. The message center says it's not running and hit the brake and the ignition button so I did, and it started and I moved out. Happened again about 5 min. later. This time it didn't just start and I had to put it in park for a moment before it would start. Lucky for me we were going slow enough that people worked around me. The third time I was moving along faster at about 20mph as the congestion was freeing up...it stalled again. It was scary, nothing works and I had to glide over to the emergency lane. Dangerous. Scary. I know the 2017 Jeep had a recall for stalling due to a BFP. Does my 2016 have this issue also? I am no longer under warranty and I can't afford to have it checked out. I called Chrysler and reported it.

58.     The Transmission Defect poses an unreasonable safety risk for Class Members and other drivers and pedestrians. A vehicle's responsiveness to driver input, such as acceleration and deceleration, and the ability of a vehicle's transmission to perform properly are critical to a vehicle's safe operation. A defect that causes one or more of these negative characteristics poses a safety hazard to the general public and increases the risk of automobile accidents.

**FCA Has Exclusive Knowledge of the Transmission Defect**

59.     FCA had superior and exclusive knowledge of the Transmission Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the

34

Class Vehicles.

60.    Plaintiff is informed and believes, and based thereon alleges, that before Plaintiff purchased his Class Vehicles, and since at least October 2013, FCA knew about the Transmission Defect through sources not available to consumers, including the following: pre-release testing data; early consumer complaints about the Transmission Defect to Defendant's dealers who are its agents for vehicle repairs; warranty claims data related to the Defect; aggregate data from FCA's dealers and reports to FCA's Service Technical Assistance Resource ("STAR") Center, its engineer/technical team; consumer complaints to the NHTSA and resulting notice from NHTSA; early consumer complaints on websites and Internet forums; dealership repair orders; testing conducted in response to owner or lessee complaints; technical service bulletins ("TSBs") applicable to the Class Vehicles; and other internal sources of aggregate information about the problem.

61.    Further, even prior to bringing the Class Vehicles to market, FCA at least twice delayed releasing vehicles equipped with the 9HP Automatic Transmission in order to address problems with the transmission for symptoms substantially similar, if not identical, to the Transmission Defect.

62.    As a result of the Transmission Defect, FCA has issued over 12 Technical Service Bulletins ("TSBs"), as well as three transmission software updates, to its dealers in the United States, acknowledging defects in the 9HP

Automatic Transmission. It has also issued a safety recall for the Jeep Renegade that indicates there is no known fix for the Defect.

63. For example, FCA issued TSB #SB-21-013-13 on or around November 14, 2013, to its dealers, covering the 2014 Jeep Cherokee, and informed them of the procedure to be followed in the event customers "indicate that their transmission shift quality does not meet their expectations" and the "New Vehicle Preparation 'Road Test'" identifies poor shift quality.

64. Further, FCA issued TSB #SB-21-014-13 on or around December 19, 2013, to its dealers, covering the 2014 Jeep Cherokee, and informed them that "SOME JEEPS, WITH NEW SOFTWARE ROBUSTNESS IMPROVEMENTS, [are] EXPERIENCING INCONSISTENT AND/OR HARSH1-2 or 2-3 UPSHIFTS."

65. Additionally, FCA's TSB #21-018-14 from or around May 15, 2014, which supersedes the December 2013 TSB (#SB-21-014-13), addressed customer complaints regarding the 2014 Jeep Cherokee transmission's poor shifting and included a "five-minute software reset" and, in some cases, a 78-minute "adaptive drive learn" test performed by the service technician to ensure appropriate shifting.[35]

---

[35] See Larry P. Vellequette, *Jeep 9-speed needs a reset again: Software tweak aims to smooth out issues with Cherokee shifting*, Automotive News (May 26, 2014, 1:00 am) http://www.autonews.com/article/20140526/OEM06/305269979/jeep-9-speed-needs-a-reset-again (last visited June 12, 2020). Exhibit 17

A Chrysler spokesperson told Automotive News that the software update was in response to "customer feedback" and "to improve satisfaction."[36] Despite issuing three successive Technical Service Bulletins and two software updates within the first six months of production, FCA CEO Sergio Marchionne assured consumers in May 2014 that "he was not concerned about the quality of the nine-speed automatic transmission" and further promised that "[i]t will get better six months from now, trust me."[37]

66.    However, consumer complaints persisted and FCA's attempts to correct the Transmission Defect again fell short. It then issued TSB #81-016-1053 on or around October 1, 2014, covering the 2014-2015 Jeep Cherokees and 2015 Chrysler 200, informing dealers that the "TRANSMISSION MAY NOT ALLOW THE TRANSAXLE  TO SHIFT GEAR DUE TO TRANSMISSION CONTROL MODULE SOFTWARE."

67.    In February 2015, FCA issued TSB #21-008-15, covering the 2014-2015 Jeep Cherokees and 2015 Chrysler 200, providing to dealers "INFORMATION REGARDING AN ISSUE, ON SOME VEHICLES, WHEREBY 5-4 DOWNSHIFTING, IS LESS THAN DESIRED AND MALFUNCTION INDICATOR LAMP (MIL) WILL ILLUMINATE AND REMOVING,

---

[36] *Id.*
[37] *Id.*

DISASSEMBLING AND REPLACING C-CLUTCH SNAP RING AND TRANSMISSION."[38]

68.    Additionally, in or around February 2015, FCA released its third transmission software update for vehicles equipped with the 9HP Automatic Transmission in response to consumer complaints reporting conditions such as "sudden lunges from unexpected downshifts, a lack of kickdown upon entering highways, front-axle vibration in low gears, and complete failures in which the transmission shifts into neutral while driving and lights up the dash with warning lights."[39]

69.    FCA issued TSB #21-015-15 on or around March 4, 2015, relating to the above-mentioned software update.  FCA re-issued this TSB on or around April 3, 2015 as TSB#21-015-15 REV. A with a more detailed and different diagnostic and repair procedure, and again on or around December 24, 2015 as TSB#21-07-015, with more detailed instructions depending on the type of vehicle being repaired.

---

[38] FCA subsequently re-issued TSB #21-008-15 twice, on or around February 7, 2015 as TSB#21-008-15 REV. A and on or around August 15, 2015 as TSB#21-008-15 REV. B.  TSB#21-008-15 REV. A reiterated that the bulletin applied to vehicles with VINs on specific lists, and TSB#21-008-15 REV. B added or changed some of the parts to be used in the service repair.

[39] See Clifford Atiyeh, *Holy Shift: ZF 9-speed Automatic Problems Mount, Chrysler Releases Third Software Update for Jeep Cherokee*, Car and Driver (Feb. 4, 2015), https://www.caranddriver.com/news/a15356669/holy-shift-zf-9-speed-automatic-problems-mount-chrysler-releases-third-software-update-for-jeep-cherokee/ (last visited June 12, 2020). Exhibit 18

70.     On or around June 4, 2016, FCA issued TSB #21-021-16, covering the 2015 Jeep Renegade.  The TSB informed dealers that "customers may experience a Malfunction Indicator Lamp (MIL) illumination" and find a number of codes upon investigation, including "Internal Control Module Torque Calculation Performance," "Stuck in Gear 4," "Unable to Engage Gear," and "Implausible Engine Torque Signal Received."  Dealers were instructed to perform a software update to the TCM.

71.     On or around June 21, 2016, FCA issued TSB #03-003-16, covering the 2014-2016 Jeep Cherokees and the 2015-2016 Chrysler 200s, relating to yet another update to a portion of the above-mentioned software, the Drivetrain Control Module, to address "a constant high pitched whine coming from rear axle area."

72.     Additionally, FCA has issued several versions of TSB#21-001-16 regarding reprogramming updates to the Transmission Control Module for certain 2016 Jeep Cherokees.  The TSBs were issued to address one or more of the following conditions:

• Less than desired low speed drivability and response to accelerator pedal input.

• Less than desired 5-4 coast down transmission shift quality.

• Less than desired transmission shift quality.

• Less than optimal transmission shift timing, driving up and down hills.

• Less than desired Engine Stop/Start re-engagement or smoothness.

• Transmission is slow to upshift after releasing the accelerator pedal.

73.    TSB#21-001-16 was re-issued on or around January 16, 2016 as TSB#21-001-16 REV. A to include a specific sales code for one of the applicable engines.  The TSB was re-issued on or around April 1, 2016 as TSB#21-001-16 REV. B to include more vehicles, encompassing 2016 Jeep Cherokees built on or before February 29, 2016, whereas the previous TSB only applied to 2016 Jeep Cherokees with a 2.4L Engine built on or before September 22, 2015 or with a 3.2L Engine built on or before October 2, 2015.  The TSB was re-issued for a second time on or around May 10, 2016 as TSB#21-001-16 REV. C to include 2016 Jeep Cherokees with a 3.2L Engine built on or before April 25, 2016.

74.    On or around November 4, 2016, FCA issued TSB #21-035-16, covering the 2014-2015 Jeep Cherokee, the 2015 Chrysler 200, the 2015 Jeep Renegade, the 2016 Fiat 500X, and the 2015 Ram ProMaster City.  This TSB informed dealers that the "[c]ustomers may experience an Malfunction Indicator Lamp (MIL) illumination after the S55 recall TCM flash as been performed."  The TSB instructed dealers to perform another software update of the TCM.

75.    On or around November 29, 2016, FCA issued TSB#21-039-16, covering the 2017 Jeep Cherokee, informing dealers that the "[c]ustomers may experience a Malfunction Indicator Lamp (MIL) illumination" and "[a] longer than

normal delay during a shift from reverse to drive selection."   TSB#21-039-16 contained instructions to dealers to reprogram the Transmission Control Module with another software update.

76.    The delays and other problems in shifting continued to persist throughout 2017, as FCA issued TSB#21-006-17 REV. A on or around June 17, 2017 and TSB#52 on or around September 17, 2017 regarding reprogramming instructions for the Transmission Control Module in the 2017 Jeep Cherokee.

77.    In TSB#21-006-17 REV. A, in addition to reporting the above-mentioned conditions of a "Malfunction Indicator Lamp (MIL) illumination" and "longer than normal delay during a shift from reverse to drive selection[,]" FCA informed dealers of the following conditions: "During a limp mode condition, the transmission remains in a fixed gear" and "5-4 downshift hesitation."

78.    In TSB#52, a Customer Satisfaction Notification, FCA informed dealers that:

> The vehicle speed on about 24,000 of the above vehicles maybe limited
> if certain conditions are met. This can occur if the vehicle is brought to
> a full stop and the gear shifter is immediately moved from "DRIVE" to
> "PARK" and then the key position is changed from "RUN" to "ACC".
> This action will cause the transmission to be limited to one gear and a
> maximum speed of 30 – 45 mph and will illuminate the Malfunction
> Indicator Lamp (MIL) on the instrument cluster and will set P0810 fault
> code.

79.    On September 14, 2017, FCA issued TSB #21-042-17, which superseded #21-031-16 from September 21, 2016.   This TSB involved

reprogramming the Transmission Control Module with new software and included 2015-2016 Jeep Renegade and 2016 FIAT 500X. The TSB noted that "[c]ustomers may experience a Malfunction Indicator Lamp (MIL) illumination," as well as various codes including "Internal Control Module Torque Calculation Performance," "Stuck in Fourth Gear," "Unable to Engage Gear," and "Implausible Data Received from ECM-PCM." The TSB also revealed that customers may notice "(h)arsh 1-2 upshift," and "(h)arsh garage shifts (Park to Reverse or Drive)."

80.     FCA is aware of the Defect and its effects, as indicated by, among other things, the November 2018 Safety Recall (Recall Number UB2/NHTSA Recall Number 18V731) relating to the Fuel Pump Module acknowledging that "a defect, which relates to motor vehicle safety, exists in certain 2017 Jeep Renegade vehicles." In the notice of safety recall to consumers, FCA reported that "[a] loss of fuel pressure may lead to an engine stall resulting in a sudden loss of motive power, which may cause a vehicle crash without prior warning." FCA further acknowledged that "[t]he remedy for this condition is not currently available."

81.     On or about May 11, 2019, FCA issued TSB #21-027-19 which applied to 2018 Jeep Renegades. FCA informed dealers that "[c]ustomers may experience…Malfunction Indicator Lamp (MIL) illumination, Electronic Vehicle Information message states 'Service Transmission' and transmission intermittently goes PRNDL flashing when vehicle is stopped. The vehicle may or may not resume

normal transmission operation after cycling the shift or ignition." Dealers were again instructed to reprogram the TCM with new software.

82.    The alleged Transmission Defect was inherent in each FCA vehicle equipped with the 9HP Automatic Transmission and was present in each FCA vehicle equipped with the 9HP Automatic Transmission at the time of sale.

83.    The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease an FCA vehicle that was equipped with the 9HP Automatic Transmission. Had Plaintiff and other Class Members known that the Class Vehicles were equipped with defective transmissions, they would not have purchased or leased the Class Vehicles equipped with the 9HP Automatic Transmissions or would have paid less for them.

84.    Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiff and Class Members further reasonably expect that FCA will not sell or lease vehicles with known safety defects, such as the Transmission Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect FCA to fail to disclose the Transmission Defect to them and to continually deny the Defect.

**FCA Has Actively Concealed the Transmission Defect**

85.    While FCA has been fully aware of the Transmission Defect in the

Class Vehicles, it actively concealed the existence and nature of the Defect from Plaintiff and Class Members at the time of purchase, lease, repair, and thereafter. Specifically, FCA failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a)    any and all known material defects or material nonconformity of the Class Vehicles, including the Defect relating to the 9HP Automatic Transmission;

b)    that the Class Vehicles, including their 9HP Automatic Transmissions, were not in good in working order, were defective, and were not fit for their intended purposes; and

c)    that the Class Vehicles and their 9HP Automatic Transmissions were defective, despite the fact that FCA learned of the Transmission Defect through alarming failure rates, customer complaints, and other internal sources, as early as November 2013.

86.    In fact, even before releasing the Class Vehicles on the market, FCA knew about the Transmission Defect and delayed releasing vehicles equipped with the 9HP Automatic Transmission because of the Defect.  Nevertheless, FCA never disclosed the Transmission Defect to Class Members.

87.    As a result of the Transmission Defect, FCA was inundated with complaints regarding the 9HP Automatic Transmission.  And, as mentioned above,

FCA issued over 12 Technical Service Bulletins ("TSBs") and three transmission software updates to its dealers in the United States, and a safety recall for the Jeep Renegade that indicates there is no known remedy for the Defect, thus internally acknowledging the 9HP Automatic Transmission Defect.

88.     On information and belief, the TBSs and software upgrades issued by FCA were ineffective at addressing the Transmission Defect.

89.     When consumers present the Class Vehicles to authorized FCA dealers for repair of the transmission, rather than repair the problem under warranty, FCA dealers either inform consumers that their vehicles are functioning properly, or "as designed," or conduct repairs or software updates that merely mask the Defect.

90.     To this day, FCA still has not notified Plaintiff and Class Members that the Class Vehicles suffer from a systemic Defect that causes the transmission to malfunction.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class and Sub-Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

92.     The Class and Sub-Class are defined as:

**Class**: All individuals residing in the United States of America, including its territories, who purchased or leased any FCA vehicle beginning in Model Year 2016 equipped with the 9HP Automatic Transmission.

**Pennsylvania Sub-Class**: All members of the Class who purchased or leased their vehicles in the State of Pennsylvania.

93.     Excluded from the Class and Sub-Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

94.     There is a well-defined community of interest in the litigation and the Class and Sub-Class are readily ascertainable.

95.     Numerosity: Although the exact number of prospective Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of prospective

Class Members' claims in a single action will provide substantial benefits to all parties and to the Court. The prospective Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various states.

96. Typicality: Plaintiff's claims are typical of the claims of the all prospective Class Members in that Plaintiff and the prospective Class Members purchased or leased a Class Vehicle designed, manufactured, and distributed by FCA and equipped with a defective 9HP Automatic Transmission. Plaintiff and all prospective Class Members have been damaged by Defendant's misconduct in that they would not have purchased their Class Vehicles, or would have paid less for the vehicles, had FCA disclosed its knowledge of the Transmission Defect and because the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run and Class Members have incurred or will incur the cost of repairing or replacing the defective transmission. Furthermore, the factual bases of FCA's misconduct are common to all prospective Class Members and represent a common thread resulting in injury to all prospective Class Members.

97. Commonality: There are numerous questions of law and fact common to Plaintiff and the prospective Class Members that predominate over any question affecting individual prospective Class Members. These common legal and factual issues include the following:

47

a)  Whether the 9HP Automatic Transmission in the Class Vehicles is defective;

b)  Whether the Transmission Defect constitutes an unreasonable safety risk;

c)  Whether and when Defendant knew about the Transmission Defect;

d)  Whether the Transmission Defect constitutes a material fact;

e)  Whether Defendant had a duty to disclose its knowledge of the Transmission Defect to Plaintiff and prospective Class Members;

f)  Whether Plaintiff and the prospective Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g)  Whether Defendant knew or reasonably should have known of the Transmission Defect before selling and leasing Class Vehicles to prospective Class Members;

h)  Whether Defendant should be declared financially responsible for notifying all prospective Class Members of the Transmission Defect and for expenses of repairing the Transmission Defect;

i)  Whether Defendant is obligated to inform prospective Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective 9HP Automatic Transmission; and

48

j)   Whether Defendant breached the implied warranty of merchantability or pursuant to 13 Pa. Cons. Stat. Ann. § 2314.

98.   <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect prospective Class Members' interests. Plaintiff has retained attorneys experienced in prosecuting class actions, including consumer and product defect class actions, and Plaintiff intends to prosecute this action vigorously.

99.   <u>Predominance and Superiority</u>: Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

100.   In the alternative, the Class may be certified because:

a)    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant;

b)    the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-1, *et seq*.

101.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 90 of this Complaint.

102.   Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Pennsylvania Sub-Class.

103.   Plaintiff and members of the Pennsylvania Sub-Class are "persons" within the context of the UTPCPL, *see* 73 Pa. Cons. Stat. § 201-1, who purchased

and/or leased Class Vehicles for personal, family, or household use.

104.    Defendant is a "person" within the context of UTPCPL.  *See* 73 Pa. Cons. Stat. § 201(2).

105.    Defendant engaged in trade and commerce within the context of UTPCPL.  *See* 73 Pa. Cons. Stat. § 201-2(3).

106.    By failing to disclose and actively concealing the defective nature of the Class Vehicles, FCA engaged in deceptive business practices prohibited by the UTPCPL, including: (i) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (ii) representing that the Class Vehicles are of a particular standard, quality, and grade, when they are not; (iii) advertising Class Vehicles with the intent not to sell them as advertised; and (iv) engaging in acts or practices that are otherwise unfair, misleading, false, or deceptive to the consumer.  *See* 73 Pa. Cons. Stat. §§ 201-2(4).

107.    FCA also violated the UTPCPL by failing to comply with the terms of its written warranty given to the buyer at, prior to, or after a contract for the purchase of goods or services is made.  *See* 73 Pa. Cons. Stat. § 201-2(4)(xiv).

108.    FCA knew that the Class Vehicles were defectively designed or manufactured and were not suitable for their intended use. FCA nevertheless failed to warn Plaintiff Milisits and the Pennsylvania Sub-Class Members about these defects despite having a duty to do so.

109.   FCA committed unconscionable, deceptive, and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, and omission of material facts concerning the Class Vehicles' transmissions, the existence of the Transmission Defect, and the corresponding risks to the safety and reliability of the Class Vehicles with the intent that Plaintiff and the Pennsylvania Sub-Class Members would reply upon their representations and omissions in connection with the sale and/or advertisement of the Class Vehicles.

110.   Defendant was under a duty to Plaintiff and Class Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

   a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions which rendered the Class Vehicles unfit for their intended purpose;

   b)   Intentionally concealed the Transmission Defect; and

   c)   Made incomplete representations about the characteristics and performance of Class Vehicles generally, while purposefully withholding material facts from Plaintiff Milisits and the Pennsylvania Sub-Class Members that contradicted these representations.

111.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Milisits and the Pennsylvania

Sub-Class Members, about the true performance, safety, reliability, and characteristics of the Class Vehicles.

112. Additionally, FCA's breaches of warranty constitute unfair and deceptive acts under Pennsylvania law. FCA warranted the Class Vehicles against defects and was further obligated under its warranty to provide replacement parts or repairs necessary to remedy failures due to defects. Instead, FCA typically denies the existence of the Transmission Defect, or else performs software updates, which is insufficient to comply with its warranty obligations since the effects of the Transmission Defect continue to occur after the updates.

113. Defendant engaged in unfair and deceptive acts when it knowingly failed to perform its warranty obligations by failing to provide repairs or replacements necessary to resolve the Defect.

114. Plaintiff and Class Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit problems such as: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; sudden loss of power; premature transmission wear; and eventually, transmission failure. This is the reasonable and objective consumer expectation relating to vehicle transmissions.

115. FCA's representations and omissions related to the Transmission

Defect and its effects were material to Plaintiff Milisits and the Pennsylvania Sub-Class because but for those representations and omissions, Plaintiff Milisits and the Pennsylvania Sub-Class would not have purchased and/or leased their Class Vehicles or would not have purchased and/or leased them for the prices they did.

116.   As a result of Defendant's conduct, Plaintiff and Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and may continue to experience problems such as: rough, delayed, or sudden shifting or failure to shift; grinding or other loud  noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; sudden loss of power; premature transmission wear; and eventually, transmission failure.

117.   As a result of its violations of the UTPCPL as detailed above, FCA caused actual damage to Plaintiff and the Pennsylvania Sub-Class, and if not stopped, it will continue to harm Plaintiff and the Pennsylvania Sub-Class Members as FCA continues to both inadequately remedy the Transmission Defect and to sell vehicles without disclosing the Defect. Additionally, as a result of the Transmission Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run and Class Members have incurred or will incur the cost of repairing or replacing the defective transmission.

118.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices alleged herein, Plaintiff and Class Members suffered and will continue to suffer actual damages, including the diminution in value of their vehicles and overpayment for their vehicles, and are entitled to recover actual damages to the extent permitted by law, including treble damages, in an amount to be proven at trial. In addition, Plaintiff and the putative Class seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty

119.   Plaintiff incorporates by reference the allegations contained in the paragraphs 1 to 90 of this Complaint.

120.   Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

121.   At all relevant times, Defendant was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

122.   Defendant provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and

safe transportation because, *inter alia*, the Class Vehicles and their transmissions suffered from an inherent defect at the time of sale and thereafter.

123.   Plaintiff and the Class were not required to notify FCA of its breach of implied warranty and/or were excused from doing so because affording FCA a reasonable opportunity to cure its breach implied warranty would have been futile. Defendant was also on notice of the Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the transmission or a component thereof, and through other internal sources.

124.   Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the transmission.

125.   In addition, on or about March 3, 2020, Plaintiff gave notice to Defendant that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

126.   Because Plaintiff purchased his vehicle from an authorized FCA dealer, Plaintiff is in privity with FCA since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.  Furthermore, under Pennsylvania law, no privity is required between the parties to assert a breach for implied warranty of merchantability.

127.    As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

128.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## THIRD CAUSE OF ACTION
### Breach of Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq*.

129.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 90 of this Complaint.

130.    Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

131.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

132.    Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

133.    Defendant FCA US LLC is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

134.    Defendant's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

135.   FCA provided all purchasers and lessees of the Class Vehicles with a New Vehicle Basic Limited Warranty and a Powertrain Limited Warranty. In this Basic Limited Warranty, FCA expressly warranted that it would "**cover**[] . . . **all parts and labor needed to repair any item on [the] vehicle** when it left the manufacturing plant that is defective in material, workmanship or factory preparation." FCA promised to cover "any item on [the] vehicle" with the exception of tires and unwired headphones under its Basic Limited Warranty, for "36 months from the date it begins or for 36,000 miles on the odometer, whichever occurs first."

136.   Furthermore, under the Powertrain Limited Warranty, FCA expressly warranted that it would "**cover the costs of all parts and labor needed to repair a powertrain component** listed in [the] section . . . below that is defective." FCA promised to cover listed powertrain components under its Powertrain Limited Warranty, including the transmission and transmission control module "for up to 5 years or 100,000 miles on the odometer, whichever occurs first."

137.   FCA breached the express warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranty, FCA falsely informed Class Members that there was no problem with their vehicles, performed ineffective software updates, or replaced defective components in the 9HP Automatic Transmissions with equally defective components, without actually repairing the vehicles. FCA's breaches ensured that the Transmission Defect would

58

continue to manifest, even outside of the Class Vehicles' express warranty period, at which point Defendant would deny any responsibility for repairing the Defect.

138. Furthermore, Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

139. Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from Transmission Defect, which renders the Class Vehicles unsafe and unable to provide reliable transportation.

140. Defendant's breach of express and implied warranties has deprived Plaintiff and Class Members of the benefit of their bargain.

141. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on

the basis of all claims to be determined in this suit.

142.   Plaintiff and the Class were not required to notify FCA of its violations of the Magnuson-Moss Warranty Act and/or were excused from doing so because affording FCA a reasonable opportunity to cure its warranty breaches would have been futile. Defendant was also on notice of the Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the transmission or a component thereof, and through other internal sources.

143.   Defendant has been afforded a reasonable opportunity to cure its warranty breaches, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the transmission.

144.   In addition, on or about March 3, 2020, Plaintiff gave notice to Defendant that he intended to pursue his Magnuson-Moss Warranty Act claim on behalf of a class of similarly situated consumers.

145.   As a direct and proximate cause of Defendant's violations of the Magnuson-Moss Warranty Act, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

## FOURTH CAUSE OF ACTION
## For Breach of Express Warranty

146.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 90 of this Complaint.

147.   Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

148.   As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiff and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

149.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

150.   Defendant manufactured and/or installed the transmission and its component parts in the Class Vehicles, and the transmission and its component parts are covered by the express  warranty.

151.   FCA provided all purchasers and lessees of the Class Vehicles with a New Vehicle Basic Limited Warranty and a Powertrain Limited Warranty. In this

Basic Limited Warranty, FCA expressly warranted that it would "**cover**[] . . . **all parts and labor needed to repair any item on [the] vehicle** when it left the manufacturing plant that is defective in material, workmanship or factory preparation." FCA promised to cover "any item on [the] vehicle" with the exception of tires and unwired headphones under its Basic Limited Warranty, for "36 months from the date it begins or for 36,000 miles on the odometer, whichever occurs first."

152.    Furthermore, under the Powertrain Limited Warranty, FCA expressly warranted that it would "**cover**[] . . . **the costs of all parts and labor needed to repair a powertrain component** listed in [the] section . . . below that is defective." FCA promised to cover listed powertrain components under its Powertrain Limited Warranty, including the transmission and transmission control module, "for up to 5 years or 100,000 miles on the odometer, whichever occurs first."

153.    FCA breached the express warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranty, FCA falsely informed Class Members that there was no problem with their vehicle, performed ineffective software flashes, or replaced defective components in the 9HP Automatic Transmissions with equally defective components, without actually repairing the vehicles.  FCA's breaches ensured that the Transmission Defect would continue to manifest, even outside of the Class Vehicles' express warranty period, at which point Defendant would deny any responsibility for repairing the Defect.

154.    Plaintiff and the Class were not required to notify FCA of its breach of express warranty and/or were excused from doing so because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the transmission or a component thereof, and through other internal sources.

155.    Further, Defendant was notified of the Defect and has been afforded a reasonable opportunity to cure its breach, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the transmission. Defendant also received notice from Plaintiff on or around March 3, 2020 via letter.

156.    As a direct and proximate cause of Defendant's breach, Plaintiff and Class Members suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

157.    Plaintiff and Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## FIFTH CAUSE OF ACTION
## Fraudulent Concealment and/or Fraud in the Inducement

158.    Plaintiff incorporates by reference the allegations contained in

paragraphs 1 to 90 of this Complaint.

159.   Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

160.   Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the standard, quality or grade of the Class Vehicles, the presence of Transmission Defect installed in the Class Vehicles, and the risk to the safety and reliability of the Class Vehicles due to the Transmission Defect.

161.   Defendant intentional and knowing concealment, suppression and/or omission of these material facts was done with the intent that Plaintiffs and Class Members would rely on Defendant's omissions.

162.   As a direct result of Defendant's fraudulent conduct, Class Members have suffered actual damages.

163.   Defendant knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Transmission Defect, but Defendant concealed the Defect and never intended to repair or replace the Defect during the warranty periods.  To date, Defendant has not provided Plaintiff or Class Members with a repair or remedy that will eliminate the Defect.

164.   Defendant owed a duty to disclose the Defect and its corresponding

safety hazard to Plaintiff and Class Members because Defendant possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the Defect, Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the Defect so that Defendant could sell additional Class Vehicles and avoid the cost of repair or replacement.

165. The Defect exposes drivers and occupants to an unreliable vehicle with a safety defect. Plaintiff and Class Members had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard. No reasonable consumer expects a vehicle to be designed, manufactured and assembled with a transmission that, like the transmission in the Class Vehicles, causes the vehicle to lurch, stall, fail to accelerate on entry to the expressway, or exhibit other dangerous conditions.

166. Plaintiff and Class Members would not have purchased or leased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles.

167. Defendant knew its concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts. Defendant knew its concealment and suppression of the Defect would enable it to sell more Class Vehicles and would discourage Plaintiff and Class Members from

seeking replacement or repair of the Defect. Further, Defendant intended to induce Plaintiff and Class Members into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Defect, in order to decrease costs and increase profits.

168. Defendant acted with malice, oppression and fraud.

169. Plaintiff and Class Members reasonably relied upon Defendant's knowing concealment and omissions. As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Defect and associated safety hazard, Plaintiff and Class Members have suffered actual damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation

170. Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 90 of this Complaint.

171. Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

172. Defendant owed a duty to disclose the Transmission Defect and its corresponding safety hazard to Plaintiff and Class Members because Defendant possessed superior and exclusive knowledge regarding the Defect and the associated risks.

173.   Defendant negligently omitted material facts concerning the Defect in the Class Vehicles. As a direct result of Defendant's negligent conduct, Class Members have suffered actual damages.

174.   The Defect is material because Plaintiff and Class Members had a reasonable expectation that the vehicles would not suffer from a defect that would expose drivers and occupants to dangerous safety issues and an unreliable vehicle. No reasonable consumer expects a vehicle to present a defect that exposes drivers and occupants to such a safety hazard.

175.   Plaintiff and Class Members would not have purchased the Class Vehicles but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles.  Plaintiff and Class Members justifiably relied upon Defendant's negligent omissions of material facts.

176.   As a direct and proximate result of Defendant's negligent omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the presence of the Defect, Plaintiffs and Class Members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment

177.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 90 of this Complaint.

178.   Plaintiff brings this cause of action against Defendant on behalf of himself and on behalf of the members of the Class or, in the alternative, on behalf of the Pennsylvania Sub-Class.

179.   Plaintiff and Class Members conferred a benefit on Defendant by leasing or purchasing the Class Vehicles.  Defendant was and should have been reasonably expected to provide Class Vehicles free from the Transmission Defect and associated safety risks.

180.   Defendant unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its omissions and concealment of the Defect in the Class Vehicles.

181.   As a proximate result of Defendant's omissions and concealment of the Transmission Defect in the Class Vehicles, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly enriched at the expense of Plaintiff and Class Members.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiffs and Class Members.

182.   Plaintiff and Class Members are entitled to restitution of the amount of Defendant's ill-gotten gains, benefits and profits, including interest, resulting from its unlawful, unjust and inequitable conduct.

183.   Plaintiff and Class Members seek an order requiring Defendant to disgorge its gains and profits to Plaintiffs and Class Members, together with interest,

in a manner to be determined by the Court.

## RELIEF REQUESTED

184.   Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against Defendant, as follows:

a)   An order certifying the proposed Class and Sub-Class, designating Plaintiff as named representative of the Class and Sub-Class, and designating the undersigned as Class Counsel;

b)   A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the 9HP Automatic Transmission;

c)   An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' 9HP Automatic Transmissions with suitable alternative product(s) that do not contain the Defect alleged herein; enjoining Defendant from selling the Class Vehicles with misleading information concerning the Defect; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such

warranty has been reformed;

d)      An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

e)      Any and all remedies provided pursuant to 13 Pa. Cons. Stat. Ann. §§ 2313-2314;

f)      A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiff and Class Members;

g)      Any and all applicable equitable relief;

h)      An award of attorneys' fees and costs, as allowed by law;

i)      An award of pre-judgment and post-judgment interest, as provided by law;

j)      Leave to amend the Complaint to conform to the evidence produced at trial; and

k)      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

185.   Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated: June 15, 2020                    Respectfully submitted,

                                        */s/ E. Powell Miller*_____
                                        E. Powell Miller (P39487)
                                        Sharon S. Almonrode (P33938)
                                        Dennis A. Lienhardt (P81118)
                                        **THE MILLER LAW FIRM, P.C.**
                                        950 W. University Drive, Suite 300
                                        Rochester, MI 48307
                                        Tel: (248) 841-2200
                                        Fax: (248) 652-2852
                                        epm@millerlawpc.com
                                        ssa@millerlawpc.com
                                        dal@millerlawpc.com

                                        **BERGER MONTAGUE PC**
                                        Russell D. Paul
                                        Jeffrey L. Osterwise
                                        Amey J. Park
                                        Abigail J. Gertner
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA  19103
                                        Tel: (215) 875-3000
                                        Fax: (215) 875-4604
                                        rpaul@bm.net
                                        josterwise@bm.net
                                        apark@bm.net
                                        agertner@bm.net

                                        **FINKELSTEIN, BLANKINSHIP,**
                                        **FREI-PEARSON & GARBER, LLP**
                                        Todd S. Garber
                                        D. Greg Blankinship
                                        Bradley F. Silverman
                                        One North Broadway, Suite 900
                                        White Plains, New York 10601
                                        tgarber@fbfglaw.com
                                        gblankinship@fbfglaw.com
                                        bsilverman@fbfglaw.com

**MAZIE, SLATER, KATZ & FREEMAN LLC**
Matthew Ross Mendelsohn
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 228-9898
Fax: (972) 328-0303
mrm@mazieslater.com

*Attorneys for Plaintiff and the Proposed Class and Sub-Class*