UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH MILISITS *et al.*,

      Plaintiffs,                         Case No. 20-cv-11578
                                              Hon. Matthew F. Leitman

v.

FCA US LLC,

      Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 16)

In this putative class action, Plaintiffs bring a variety of statutory and common-law claims against Defendant FCA US LLC ("FCA") arising out of an alleged safety defect in the transmissions of their FCA vehicles. (*See* Am. Compl., ECF No. 14.)  FCA has now moved to dismiss Plaintiffs' claims. (*See* Mot. to Dismiss, ECF No. 16.)  For the reasons that follow, FCA's motion is **GRANTED IN PART AND DENIED IN PART**.

### I

FCA was one of the world's leading automakers.  In the 2014 model year, FCA introduced a new "9-speed automatic transmission" into its fleet of vehicles (the "9-Speed Transmission"). (Am. Compl. at ¶1, PageID.580-581.)  The 9-Speed Transmission "was supposed to serve as a significant technological advancement

1

from previously employed six-speed automatic transmissions, due to its unique 9:8 ratio spread and computer-controlled shifting, which were designed together to allow for better performance and fuel economy, while maintaining the ease of use of a traditional automatic transmission." (*Id.* at ¶2, PageID.581.)

Plaintiffs are consumers "who purchased or leased any Model Year 2016 or later FCA [] vehicle equipped with [the 9-Speed Transmission]" (the "Class Vehicles"). (*Id.* at ¶1, PageID.580.) They say that the 9-Speed Transmission is "plagued with problems" and "contains a design and/or manufacturing defect …. that [] stems from the Transmission Control Module ("TCM") and its software" (the "Transmission Defect"). (*Id.* at ¶¶ 3, 14-15, PageID.581, 587.) Plaintiffs assert that the Transmission Defect causes several unsafe driving conditions, including "delayed acceleration, abrupt forward propulsion and sudden loss of power, which present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration." (*Id.* at ¶16, PageID.587-588.) And Plaintiffs insist that "these conditions may make it difficult to safely change lanes, make turns, merge into traffic, accelerate from stop light/sign, and accelerate onto highways/freeways." (*Id.*) Finally, Plaintiffs claim that even though FCA "knew about [the] Transmission Defect … along with the attendant dangerous safety problems, [FCA] concealed this information from Plaintiffs" and the public. (*Id.* at ¶26, PageID.590.) Plaintiffs maintain that "had [they] known about the

2

[Transmission] Defect at the time of sale or lease, [they] would not have purchased or leased the Class Vehicles or would have paid less for them." (*Id.* at ¶27, PageID.590.)

## II

Plaintiffs filed their amended Consolidated Class Action Complaint, the operative pleading in this action, on October 5, 2020. (*See* Am. Compl., ECF No. 14.) The named Plaintiffs are as follows:

- Joseph Milisits, a Pennsylvania resident who purchased a "a new 2018 Jeep Renegade from #1 Cochran Chrysler Dodge Jeep Ram, an authorized FCA dealer in Natrona Heights, Pennsylvania" in or around January 2019. (*Id.* at ¶29, PageID.590.);

- Howard Shreve, a Texas resident who purchased a "a new 2017 Jeep Renegade from Bill Luke Chrysler Jeep Dodge RAM, an authorized FCA dealer in Phoenix, Arizona" in October 2017. (*Id.* at ¶41, PageID.592-593.);

- Mark Weber, a Connecticut resident who purchased "a new 2019 Jeep Cherokee from Milford Auto Group, an authorized FCA dealer in Milford, Connecticut" in August 2018. (*Id.* at ¶55, PageID.595.);

- Jennifer Hurst, a Florida resident who purchased a "new 2016 Jeep Cherokee from Greenway Chrysler Dodge Jeep RAM, an authorized FCA dealer in Orlando, Florida" in November 2015. (*Id.* at ¶68, PageID.598;)

- Brian Razen, a Florida resident who purchased a "new 2017 Jeep Renegade [] from Greenway Dodge/Chrysler, an authorized FCA dealer in Orlando, Florida" in February 2018. (*Id.* at ¶84, PageID.602.);

- Seana Del Rosario, a Hawai'i resident who purchased "a new 2016 Jeep Renegade from Cutter Chrysler Jeep Dodge, an authorized FCA dealer in Pearl City, Hawai'i" in November 2016. (*Id.* at ¶99, PageID.606.);

- Jessica Landgrebe, a Minnesota resident who purchased a "a new 2017 Jeep Cherokee from Bloomington Chrysler Jeep Dodge Ram, an authorized FCA dealership located in Bloomington, Minnesota" in October 2017. (*Id.* at ¶110, PageID.608);

- Lisa Cummings, a New York resident who purchased a "brand-new 2016 Jeep Cherokee with a 9-Speed Transmission from an FCA authorized dealer, Fuccillo, in Adams, New York" in January 2016. (*Id.* at ¶122, PageID.611.);

- Dan Martinez, a New York resident who leased a "a new 2019 Jeep Cherokee from White Plains Chrysler Jeep Dodge, an authorized FCA dealer in White Plains, New York" in November 2018. (*Id.* at ¶138, PageID.615.)

- Michael Muller, a New York resident who purchased a "a certified pre-owned 2016 Jeep Renegade from M&M Auto Group, an authorized FCA dealer in Liberty, New York" in October 2016. (*Id*. at ¶150, PageID.617-618);

- Aleathia Braun, a Texas resident who purchased "a new 2017 Jeep Cherokee from Ron Tonkin Chrysler Jeep Dodge RAM Fiat, an authorized FCA dealer in Milwaukie, Oregon" in December 2017. (*Id.* at ¶160, PageID.620.);

- Gary Rousseau, a Florida resident who purchased a "new 2016 Jeep Cherokee from Cooper Motor Company, an authorized FCA dealer in Clinton, South Carolina" in December 2015. (*Id.* at ¶171, PageID.622);

- Marsha Pigg, a Texas resident who purchased a "a new 2017 Jeep Renegade from AutoNation Chrysler Dodge Jeep RAM, an authorized FCA dealer in Fort Worth, Texas" in January 2018. (*Id.* at ¶181, PageID.624.); and

- Amy Long, a Virginia resident who purchased a "purchased a new 2017 Jeep Cherokee from Koons of Tysons Corner, Inc., an authorized FCA dealer in Vienna, Virginia" in April 2017. (*Id.* at ¶193, PageID.626.)

Plaintiffs bring claims against FCA for breach of express and implied warranties, breach of the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the "MMWA"), fraud, unjust enrichment, and violations of the consumer protection laws of various states. They seek to represent a class of nationwide plaintiffs and individual state-specific sub-classes.

FCA moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 4, 2020. (*See* Mot. to Dismiss, ECF No. 16.) The Court held a video hearing on the motion on June 8, 2021.

### III

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that

the defendant is liable for the alleged misconduct. *See id*.   When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).   Mere "conclusions," however, "are not entitled to the assumption of truth.   While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.   A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

FCA moves to dismiss Plaintiffs' claims on several different grounds.   The Court will address each of FCA's bases for dismissal separately in the order that FCA presented them in its briefing.

## A

The Court begins with FCA's assertion that all of Plaintiffs' claims should be dismissed under Rule 8(a) of the Federal Rules of Civil Procedure.   That rule requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).   FCA argues that Plaintiffs' claims do not satisfy Rule 8(a) because their allegations do not provide "'fair notice' of the purported

'Transmission Defect' or the nature of the defect." (Mot. to Dismiss, ECF No. 16, PageID.992.)  More specifically, FCA says that "Plaintiffs' allegations [] are clearly deficient" because they "describe the defect only in terms of an assortment of subjective vehicle symptoms" and otherwise "rely on generalities" that do not explain "how [the Class Vehicles] are defective." (*Id.*, PageID.990-991.)  The Court disagrees.

Plaintiffs' Amended Complaint satisfies Rule 8(a).   In the Amended Complaint, Plaintiffs identify the part of the Class Vehicles that they believe is defective – the 9-Speed Transmission – and they explain that "the [Transmission Defect] stems from the [TCM] and its software." (Am. Compl. at ¶15, ECF No. 14, PageID.587.)   Plaintiffs also identify examples of how the defect allegedly manifests. (*See*, *e.g.*, *id.* at ¶16, PageID.587-588.)  Courts have deemed these types of allegations sufficient under Rule 8(a). *See Hardt v. Chrysler Grp. LLC*, 2015 WL 12683965, at *5 (C.D. Cal. June 15, 2015) (denying motion to dismiss under Rule 8(a) and holding that "[p]laintiffs' allegation that 'the Manual Transmission contains one or more design and/or manufacturing defects,' combined with a description of the symptoms of the alleged defect, including … the transmission failing to engage or disengage, and the vehicle's subsequent failure to accelerate or decelerate, provide[d] Chrysler sufficient notice of the defect at issue"); *Gregorio v. Ford Motor Company*, --- F.Supp.3d ---, 2021 WL 778913, at ** 3-4 (E.D. Mich. Mar. 1, 2021)

(questioning defendant's assertion that "a defect cannot be defined predominantly by symptoms" and rejecting argument that plaintiff had failed to adequately "allege a [transmission] defect").

FCA counters that Plaintiffs do not "identify the particular components that are alleged to be defective and plead facts explaining how they are defective." (Mot. to Dismiss, ECF No. 16, PageID.990; emphasis removed.)  But Plaintiffs are "not required to plead the mechanical details of an alleged defect in order to state a claim." *Cholankyyan v. Mercedes-Benz USA, LLC*, 796 F.Supp.2d 1220, 1237 n.60 (C.D. Cal. 2011).  Indeed, as another Judge of this Court recently explained in *Francis v. General Motors*, 504 F.Supp.3d 569 (E.D. Mich. 2020), it is "unsurprising[]," and not fatal, that Plaintiffs would not "understand fully the root cause of the … malfunctions" before discovery has even started. *Id.* at 682.

For all of these reasons, the Court declines to dismiss Plaintiffs' claims under Rule 8(a).

## B

FCA next argues that Plaintiffs' express warranty claims fail for two reasons.[1] (*See* Mot. to Dismiss, ECF No. 16, PageID.993-995.)  The Court disagrees.

---

[1] *See* Counts I, VI, XVI, XV, XXI, XXVI, XXXIII, XXXIX, XLV, XLIX, LIV, and LIX of the First Amended Complaint.

**1**

FCA first argues that the express warranty does not apply to the Transmission

Defect.  In relevant part, that warranty provides as follows:

> The Basic Limited Warranty covers the cost of all parts
> and labor needed to repair any item in your vehicle when
> it left the manufacturing plant that is defective in material,
> workmanship, or factory preparation.

(Warranty, ECF No. 16-2, PageID.1025.)  FCA says that this warranty does "not

cover[]" design defects. (Mot. to Dismiss, ECF No. 16, PageID.995.)  FCA then

insists that "Plaintiffs' express warranty claims must be dismissed because their own

pleaded allegations make it absolutely clear that an alleged design defect is at issue."

(*Id.*, PageID.994.)

However, Plaintiffs plausibly allege that the Transmission Defect could arise

from *either* a design defect *or* a defect in manufacturing and/or materials.  For

example, Plaintiffs allege that "the [9-Speed] Transmission contains a design and/or

manufacturing defect." (Am. Compl. at ¶14, ECF No. 14, PageID.587. *See also id.*

at ¶338, PageID.674: "FCA knew that the Class Vehicles were defectively designed

or manufactured and were not suitable for their intended use"; ¶506, PageID.708:

"Defendant actively suppressed the fact that Class Vehicles contain the

Transmission Defect that presents a safety hazard because of materials,

workmanship, design and/or manufacturing defects.")  At the motion to dismiss

stage, "courts have rejected efforts to create an artificial distinction between design

and materials/workmanship defects." *Persad v. Ford Motor Co.*, 2018 WL 3428690, at *5 (E.D. Mich. July 16, 2018).  Because the facts alleged here could be consistent with a defect in manufacturing or materials, "Plaintiffs are not required to commit to a single theory of the origin of the [Transmission Defect] at this [early stage]." *Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at *15.

FCA counters that the fact that Plaintiffs allege "that the [Transmission Defect] exists in every one of the hundreds of thousands of Class Vehicles sold over multiple years …. confirms that only a design defect is at issue, regardless of any offhand and conclusory references to 'manufacturing.'" (Mot. to Dismiss, ECF No. 16, PageID.994.)  But "just because Plaintiffs plead allegations involving a class of vehicles does not preclude the possibility of a manufacturing defect." *Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at *15.  Indeed, it is "logically possible that either … the transmissions work badly even though [they were] built as designed" *or* "that they were all badly built, even though well-patterned." *Francis*, 504 F.Supp.3d at 673 (emphasis removed).  Thus, where, as here, a party pleads "facts consistent with a defect that could be due to either poor design, or to poor materials and workmanship," the resolution of that question should "await development of the

[factual] record." *Id.*[2] The Court therefore declines to dismiss Plaintiffs' express warranty claims on the basis that Plaintiffs plead only a design defect claim.

2

Second, FCA argues Plaintiffs do not sufficiently allege that FCA breached any express warranties. (*See* Mot. to Dismiss, ECF No. 16, PageID.995-996.) FCA says that Plaintiffs acknowledge that FCA "either provided a free repair or could not replicate any issue [that required a repair]." (*Id.*) And FCA insists that under those circumstances, it did not breach the express warranties. (*See id.*) The Court disagrees.

FCA promised in its express warranty that it would repair Plaintiffs' vehicles, and Plaintiffs sufficiently allege that FCA has failed to live up to that promise. More specifically, Plaintiffs plausibly allege that (1) their 9-Speed Transmissions are defective and (2) FCA has not fixed the transmissions even though Plaintiffs presented their vehicles for repair, sometimes on multiple occasions. For example,

---

[2] *See also In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F.Supp.3d 975, 1011 (E.D. Mich. 2017) ("At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing'"); *Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives").

Plaintiff Hurst alleges that in April 2016, she took her Jeep Cherokee to an authorized FCA dealer for repairs due to "problems with her transmission," and the dealership "performed software updates to various modules in the vehicle, including for the TCM." (Am. Compl. at ¶74, ECF No. 14, PageID.600.)  However, the repair "did not fix the Transmission Defect," and Hurst continued to experience problems with her 9-Speed Transmission. (*Id.* at ¶75, PageID.600.)  When she returned her car for additional necessary repairs, she was told there was nothing that could be done because her "concern" could not be "replicated." (*Id.* at ¶77, PageID.600.)  Hurst (like the other Plaintiffs, all of whom have made similar allegations), therefore plausibly alleges that FCA has failed to comply with its promise in the warranty to "repair any item in [the] vehicle … that is defective in material, workmanship, or factory preparation." (Warranty, ECF No. 16-2, PageID.1025.)  The Court therefore will not dismiss Plaintiffs' express warranty claims. *See In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F.Supp.3d 975, 1010 (E.D. Mich. 2017) (declining to dismiss express warranty claim where "plaintiffs have alleged that the defendant failed or refused to repair" an allegedly defective part); *Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at *17 (declining to dismiss plaintiffs' express warranty claim where plaintiffs brought vehicle for repair and defendant was "either unwilling or unable to fix their defective transmission"). To the extent that FCA

claims that there is no defect to repair, that contention can be explored during discovery and, if appropriate, raised during summary judgment.

## C

The Court now turns to Plaintiffs' implied warranty claims.[3] FCA first argues that all of Plaintiffs' implied warranty claims fail. (*See* Mot. to Dismiss, ECF No. 16, PageID.997-999.) In the alternative, FCA says that Plaintiffs' breach of implied warranty claims under the laws of New York, Florida, and Connecticut fail due to a lack of privity. The Court agrees with FCA that Plaintiffs' breach of implied warranty claim is not cognizable under Connecticut law, but it otherwise declines to dismiss the remainder of Plaintiffs' implied warranty claims.

## 1

FCA first argues that the Court must dismiss all of Plaintiffs' breach of implied warranty claims because Plaintiffs fail to plead that their vehicles are "unmerchantable." (*Id.*, PageID.997.) FCA insists that "a vehicle breaches the implied warranty of merchantability only where it is 'inoperable or unusable for the ordinary purpose of transportation,'" and FCA says that Plaintiffs' allegations do not "support the notion that Plaintiffs' vehicles are inoperable or cannot be driven." (*Id.*,

---

[3] *See* Counts I, II, V, XV, XX, XXV, XXXII, XXVIII, XLIII, LIII, LVIII of the First Amended Complaint.

quoting *Weidman v. Ford Motor Co.*, 2020 WL 674348, at ** 4-5 (E.D. Mich. Feb. 11, 2020.)

The Court is "not persuaded by [FCA's] argument that [the Class Vehicles are] merchantable just because [Plaintiffs] continued to drive [them] despite the [Transmission] Defect." *In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d 618, 633 (E.D. Mich. 2019) (declining to dismiss breach of implied warranty claim even though plaintiff continued to drive his allegedly defective vehicle). "For an automobile to be merchantable in the usual sense, the law requires more than that it simply move from point to point under its own power. Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to provide transportation, but also do so in a reasonably safe and reliable manner." *Francis*, 504 F.Supp.3d at 675 (internal quotation marks omitted). This is why "[f]ederal courts considering implied warranty claims in auto defect litigation consistently have held that an automobile is merchantable or fit for its intended purpose only where it is able reliably to operate in a 'safe condition' or to provide 'safe transportation.'" *Id.* at *8 (collecting cases).

Here, Plaintiffs plausibly allege that the Class Vehicles do not "operate in a safe condition" and do not "provide safe transportation." Plaintiffs allege that due to the Transmission Defect, their vehicles have "failed to accelerate in the middle of heavy traffic" (Am. Compl. at ¶76, ECF No. 14, PageID.600), had "the engine shut

14

off completely" on the interstate (*id.* at ¶89, PageID.603), and "totally lost power and stalled" while "driving on the highway" (*id*. at ¶105, PageID.607).  These defects put the safety of the driver and passengers in danger. *See*, *e.g.*, *Matanky v. Gen. Motors LLC*, 370 F.Supp.3d 772, 786 (E.D. Mich. 2019) (concluding that plaintiffs had "adequately plead[ed]" that an alleged defect "seriously impair[ed] the safety, reliability, and operability of their cars" where plaintiffs alleged that defect caused their cars to "lose engine power[] and substantially decrease speed unexpectedly").  Plaintiffs therefore plausibly allege that their vehicles were unmerchantable, and the Court declines to dismiss Plaintiffs' implied warranty claims on this basis.

## 2

In the alternative, FCA argues that the breach of implied warranty claims brought under New York, Florida, and Connecticut law[4] "are also subject to dismissal for lack of privity" because the Plaintiffs from those states "did not purchase their vehicles directly from FCA." (Mot. to Dismiss, ECF No. 16, PageID.998.)  The Court agrees that the implied warranty claim under Connecticut law fails for lack of privity, and it will dismiss that claim.  However, the Court declines to dismiss Plaintiffs' implied warranty claims under Florida and New York law.

---

[4] *See* Counts XV, XX, and XXXVIII of the First Amended Complaint.

The Court begins with Plaintiffs' implied warranty claim under Florida law. In general, "privity of contract is required to maintain an action for breach of an implied warranty" under Florida law. *Ocana v. Ford Motor Co.*, 992 So.2d 319, 325 (Fla. 3d DCA 2008). Plaintiffs insist that this general rule is no bar to their implied warranty claim because that "claim[] clearly fall[s] within the third-party beneficiary exception to [Florida's] privity requirement[]." (Resp. to Mot. to Dismiss, ECF No. 20, PageID.1576.) There is a sharp divide among Florida federal courts with respect to whether Florida recognizes this exception to the privity requirement at all. *Compare Sanchez-Knutson v. Ford Motor Co.*, 52 F.Supp.3d 1223, 1234 (S.D. Fla. 2014) (recognizing third-party beneficiary exception under Florida law) *with Padilla v. Porsche Cars N. Am., Inc.*, 391 F.Supp.3d 1108 (S.D. Fla. 2019) (declining "to follow *Sanchez-Knutson*," and holding that, consistent with " the overwhelming weight of Florida authority, [....] contractual privity [could not] be established through the third-party beneficiary exception"). Moreover, there is a dispute about whether – if the third-party beneficiary exception does exist under Florida law – it sensibly applies under the circumstances that exist here. *See*, *e.g.*, *Shearer v. Thor Motor Coach, Inc.*, 470 F.Supp.3d 874, 886 (N.D. Ind. 2020) (applying Florida law and questioning whether automotive purchaser is a third-party beneficiary of the automotive sales contract into which a warranty would be implied) (citing *Fuller v. Marinemax East, Inc.*, 2020 WL 3266195, at *4 (S.D. Fla. Mar. 10, 2020)).

The Court declines to resolve these questions now.  In total, the parties' briefing on the privity question amounts to little more than a single page, and neither party has wrestled with these complex issues under Florida law.  The Court therefore concludes that these questions are more appropriately resolved on summary judgment upon a full record and more detailed briefing from the parties.

For the same reasons, the Court declines to dismiss Plaintiffs' breach of implied warranty claim under New York law.  The parties dispute whether and to what extent the third-party beneficiary exception applies under New York law, and the Court concludes that it requires more extensive briefing from the parties before it can resolve those questions.  The Court will turn back to this issue on summary judgment.

The Court will, however, dismiss Plaintiffs' breach of implied warranty claim under Connecticut law because Plaintiffs have not persuaded the Court that Connecticut recognizes the third-party beneficiary exception to the privity requirement.  The only authority that Plaintiffs identify for the proposition that Connecticut recognizes this exception is *In re Volkswagen Timing Chain Product Liability Litigation*, 2017 WL 1902160, at *16 (D.N.J. May 8, 2017).  And, in that case, the court did say "while a party may generally be required to be in vertical privity with its adversary to assert a breach of implied warranty claim in California, *Connecticut*, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and

Washington, Plaintiffs herein are not required to meet said requirement." *Id.* (emphasis added). But the court did not cite any Connecticut authority in support of that proposition. *In re Volkswagen* is therefore not persuasive authority in support of Plaintiffs' argument under Connecticut law. And in *Francis*, *supra*, the court dismissed an implied warranty claim under Connecticut law for lack of privity and relied on cases citing and applying Connecticut law when doing so. *See Francis*, 504 F.Supp.3d at 678 ("[U]nder … Connecticut … law, the lack of privity is fatal to implied warranty claims") (citing *Lessin v. Ford Motor Co.*, 2020 WL 6544705, at *8 (S.D. Cal. Nov. 6, 2020), which relied upon *Kahn v. Volkswagen of Am., Inc.*, 2008 WL 590469, at *8 (Conn. Super. Ct. Feb. 13, 2008)). *See also Matanky*, 370 F.Supp.3d at 787-88 (dismissing implied warranty claim under Connecticut law due to lack of privity and rejecting argument that claim could be saved by third-party-beneficiary exception) (citing *Ossolinski v. Ford Motor Co.*, 2014 WL 4638171, at *10 (Conn. Super. Ct. Aug. 12, 2014).) The Court therefore will dismiss Plaintiffs' breach of implied warranty claim under Connecticut law only (Count XV of the Amended Complaint).

## D

FCA next argues that the Court should dismiss Plaintiffs' fraud-based claims, which include both common-law fraud claims and "claims for violation of consumer

fraud statutes enacted in the states where they purchased their vehicles."[5] (Mot. to Dismiss, ECF No. 16, PageID.999.)  Plaintiffs' fraud-based claims rest on two different predicates: alleged affirmative misrepresentations and alleged fraudulent omissions.  The Court agrees that Plaintiffs fail to state viable claims based on any affirmative misrepresentations that FCA is alleged to have made about the Class Vehicles.  However, for the reasons stated below, the Court declines to dismiss Plaintiffs' fraud-based claims to the extent that they rely on FCA's alleged fraudulent omissions.

**1**

To the extent that Plaintiffs' fraud-based claims are based on affirmative misrepresentations, the Court will dismiss those claims.  In the First Amended Complaint, Plaintiffs allege that FCA affirmatively "promised that the new transmission would deliver 'numerous benefits customers will appreciate, including aggressive launches, smooth power delivery at highway speeds and improved fuel efficiency versus a six-speed automatic transmission.'" (Am. Compl. at ¶211, ECF No. 14, PageID.631.)  FCA also allegedly represented that the Class Vehicles were "fully functional, safe, durable, and/or reliable." (*Id.* at ¶34, PageID.591.)  But these largely general representations are classic examples of non-actionable puffery, *i.e.*,

---

[5] *See* Counts III, IV, VII, VIII, X, XI, XII, XIV, XVII, XIX, XXII, XXIV, XXVIII, XXX, XXXI, XXXIV, XXXVI, XXXVII, XL, XLII, XLV, XLVII, L, LII, LVII, and LX of the First Amended Complaint.

"an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Pizza Hut, Inc. v. Papa John's Intern. Inc*., 227 F.3d 489, 497 (5th Cir. 2000). *See also Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018) (explaining that "puffery is a fact of life" and that "reasonable consumers know that marketing involves some level of exaggeration—what the law calls 'puffery.'"). Courts in this district have repeatedly held that the kind of broad, non-quantifiable statements about a vehicle's safety or reliability that Plaintiffs identify here are non-actionable puffery, and this Court agrees with those rulings. *See*, *e.g.*, *Bledsoe v. FCA US LLC*, 378 F.Supp.3d 626, 648-49 (E.D. Mich. 2019) ("Defendants' individual statements along the lines that the trucks are the cleanest or best in the world are nonactionable puffery"); *Gamboa v. Ford Motor Company*, 381 F.Supp.3d 853, 875 (E.D. Mich. 2019) ("[P]romises of efficiency and reliability 'cannot form the basis for a fraud claim.'"); *Raymo v. FCA US LLC*, 475 F.Supp.3d 680, 706 (E.D. Mich. 2020) ("Statements such as 'leading fuel economy,' 'unprecedented performance and fuel economy,' 'environmentally clean,' 'low-cost of ownership' and 'built to last for years' are general and nonquantifiable. The Court therefore considers them nonactionable puffery."). Plaintiffs' fraud-based claims that arise out of FCA's alleged affirmative misrepresentations are therefore dismissed.

**2**

The Court next turns to Plaintiffs' fraud-based claims that arise out of FCA's alleged fraudulent omissions. "For claims involving fraudulent omissions," like those at issue here, Federal Rule of Civil Procedure 9(b) "requires a plaintiff to plead the who, what, when, where, and how of the alleged omission." *McKee*, 376 F.Supp.3d at 760-61. "Specifically, a plaintiff pleading a fraudulent omission must allege (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* at 761 (internal quotation marks omitted). In the context of an allegedly defective product, "[a] complaint may suffice if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Id*

**a**

FCA first argues that the Court should dismiss all of Plaintiffs' fraudulent omission claims because Plaintiffs fail to plead that FCA had knowledge of the Transmission Defect. (*See* Mot. to Dismiss, ECF No. 16, PageID.1002-1008.) FCA insists that Plaintiffs' "generic and conclusory averments" regarding FCA's alleged

knowledge "are nowhere close to sufficient." (*Id.*, PageID.1003.)   The Court disagrees.

In essence, Plaintiffs plausibly allege that FCA was aware that the 9-Speed Transmission was defective when it was first introduced and was aware that its various attempts to remedy the Transmission Defect over the next several years – including the years in which Plaintiffs purchased their vehicles – were not effective. Plaintiffs' allegations regarding FCA's knowledge of the Transmission Defect and the actions it took with that knowledge can fairly be summarized as follows:

- FCA designed the 9-Speed Transmission to be used in its 2014 model year and later vehicles. (*See* Am. Compl. at ¶1, ECF No. 16, PageID.580-581.)

- "[P]rior to releasing" vehicles with the 9-Speed Transmission, "FCA knew that the transmission was plagued with problems." (*Id.* at ¶3, PageID.581.)  That knowledge can be inferred from, among other things, FCA's decision to delay shipping several vehicles that were supposed to include the new 9-Speed Transmission, (*see id.* at ¶¶ 4, 7, PageID.581-583), automotive press reports that detailed FCA's ongoing problems with the transmission, such as glitches in the transmission's software, and highlighted consumer complaints about the transmission (*see id.* at ¶¶ 4-5, 7, PageID.582-583), and public comments by FCA executives acknowledging FCA's ongoing struggles with the transmission (*see id.*).

- FCA knew after it began shipping vehicles in the 2014 and 2015 model years that included the 9-Speed Transmission that the transmission remained a problem.  That knowledge can be inferred from several Technical Service Bulletins ("TSBs") that FCA issued arising out of the Transmission Defect beginning in November 2013 and extending to June 2016. (*See*, *e.g.*, *id.* at ¶¶ 240-244, 246-247 PageID.648-652.)   These TSBs highlighted that the 9-Speed Transmission had "poor shift quality" (*id.* at ¶240, PageID.648) and that the TCM "may not allow the transaxle to shift gear[s]" (*id.* at ¶243, PageID.649).  In addition, FCA's knowledge of the ongoing problems with the Transmission Defect can be inferred from additional press reports in February of 2015 that highlighted consumer complaints about the transmission. (*Id.* at ¶213, PageID.632-633.)

- Finally, FCA knew that problems with the 9-Speed Transmission were ongoing with cars in the 2016 and later model years.  This knowledge can be inferred from several additional TSBs that FCA issued arising out of the Transmission Defect starting in January 2016. (*See*, *e.g.*, *id.* at ¶¶ 248-258, PageID.650-654.)   These TSBs highlighted that the TCM needed additional software updates and/or reprogramming. (*See id.* at ¶248-249, PageID.650-561.)   In addition, this knowledge can be inferred from

several software updates to the TCM software that FCA issued in 2015 and 2016. (*See id.* at ¶¶ 245, 252 PageID.650, 652.)

Taken together, these contentions plausibly allege that FCA had pre-sale knowledge of the Transmission Defect.

FCA counters that the vast majority of Plaintiffs' knowledge-based allegations are unrelated to the Class Vehicles. For example, FCA says that "most of the TSBs that Plaintiffs cite actually relate only to model-year 2015 and earlier vehicles, which no Plaintiff owns, and which are not even at issue in this case." (Mot. to Dismiss, ECF No. 16, PageID.1004, emphasis removed; *see also* FCA Supp., ECF No. 42, PageID.2750-2753, discussing TSBs.) And FCA insists that allegations regarding these earlier model years "cannot support the notion that FCA [] was aware of the purported defect in model year 2016 through 2019 vehicles." (*Id.*)

But Plaintiffs plausibly allege that that the same 9-Speed Transmission that FCA first installed in its model year 2014 vehicles is the same transmission is installed in each of the Class Vehicles. Indeed, in the Amended Complaint, Plaintiffs define the 9-Speed Transmission to mean the new transmission that GM first installed in its model year 2014 vehicles (*see* Am. Compl. at ¶1, ECF No. 16, PageID.580, defining term), and Plaintiffs then allege that "the Class Vehicles utilize the same or substantially similar [9-Speed] Transmission, and the Transmission Defect is the same for all Class Vehicles." (*Id.* at ¶18, PageID.588; *see also id.* at

24

¶25, PageID.589: "The alleged Transmission Defect was inherent in each FCA vehicle equipped with the [9-Speed] Transmission and was present in each FCA vehicle equipped with the [9-Speed] transmission at the time of sale.")  Moreover, where an automaker has knowledge of a defect in a "prior similar design" of a particular part, that "accretion of knowledge" can be used to show that the automaker had pre-sale knowledge of the same defect in the at-issue part. *Francis*, 504 F.Supp.3d at 685. *See also Hardt,* 2015 WL 12683963, at ** 5-6 (rejecting argument that TSB issued for transmission defect in Dodge Journey was not probative of defendant's knowledge of transmission defect in Dodge Dart where the plaintiff alleged that the same transmission was installed in both vehicles and both vehicles had "similar, if not identical" defects); *MacDonald v. Ford Motor Co.*, 37 F.Supp.3d 1087, 1093 (N.D. Cal. 2014) ("Although the first TSB [identified by the plaintiffs] related only to the 2005 Ford Escape Hybrids, it is plausible that Ford knew of the defect in other model years because Plaintiffs allege the allegedly defective part in their vehicles is the same").

FCA also insists that Plaintiffs' allegations about pre-release testing and consumer complaints are too generic and vague to support a finding of pre-sale knowledge. (*See* Mot. to Dismiss, ECF No. 16, PageID.1003-1004; Reply Br., ECF No. 21, PageID.2175-2177.)  In support of this argument, FCA relies on the Sixth Circuit's recent decision in *Smith v. Gen. Motors LLC*, 988 F.3d 873 (6th Cir. 2021).

(*See* FCA Resp. Br., ECF No. 39, PageID.2659. citing *Smith*.)   In *Smith*, the Sixth

Circuit explained that "to support [] a claim" that an automaker had pre-sale

knowledge of a particular defect, "a complaint must contain specific facts showing

the manufacturer's knowledge of the defect that it fraudulently concealed.   Mere

assertions that a manufacturer's routine testing, along with customer feedback and

increased warranty claims, should have alerted it to a dangerous defect are not

enough to meet the 12(b)(6) pleading standard." *Smith*, 998 F.3d at 886.   But *Smith*

does not control here because Plaintiffs do more than merely assert that FCA's

testing and consumer complaints put FCA on notice of the Transmission Defect.

Plaintiffs plausibly allege that FCA's top executives were aware of testing and/or

performance issues that demonstrated the existence of the Transmission Defect. (*See*

Am. Compl. at ¶¶ 4, 213, ECF No. 14, PageID.581-582, 632-633.)   And Plaintiffs

do more than identify consumer complaints about the Transmission Defect.   They

allege that those complaints were highlighted by the automotive press in a manner

that plausibly supports a reasonable inference that they came to the attention of FCA.

(*See id.*)

In sum, the Amended Complaint plausibly alleges that FCA had pre-sale knowledge of the Transmission Defect.[6]

**b**

FCA next argues that Plaintiffs' fraudulent omission claims under the states of Arizona, Florida, Hawai'i, Pennsylvania, and Texas are barred by the economic loss doctrine.[7]   FCA says that "[t]he economic loss rule bars recovery in tort for the breach of a contractual obligation where only economic damages are sought," and they assert that "here, Plaintiffs' purported damages are purely economic." (Mot. to Dismiss, ECF No. 16, PageID.1008.)

Whether the economic loss doctrine bars Plaintiffs' fraudulent omission claims is an especially complex issue with seemingly persuasive authority on both sides and with potentially different applications of the doctrine under the laws of different states. Given the page limits imposed on the motion-to-dismiss briefing, neither party was able to fully develop their arguments concerning the applicability of the doctrine to Plaintiffs' claims.   Indeed, FCA's entire argument regarding the economic loss doctrine is just two sentences (*see id.*), and Plaintiffs' response

---

[6] At summary judgment, FCA may present evidence that the 9-Speed Transmission in the Class Vehicles is different from the transmission that FCA sold in its 2014 and 2015 model year vehicles.

[7] *See* Counts IV, VII, VIII, XI, XII, XXII, XXVIII, LII, and LV of the First Amended Complaint.

amounts to little more than a long string-cite of case law with no analysis of that authority. (*See* Resp. to Mot. to Dismiss, ECF No. 20, PageID.1591-1593.)

The Court concludes that, given the complexity of the economic-loss-doctrine issues in this case, the soundest course of action is to defer decision on application of the doctrine until the summary judgment stage of these proceedings. At that time, if necessary, the Court will grant the parties additional page extensions in order to fully brief this issue on a state-by-state basis.

Deferring a decision on FCA's economic-loss-doctrine arguments should not meaningfully change the scope of proceedings moving forward.  For all of the reasons explained above, Plaintiffs will be allowed to proceed to discovery all of their fraudulent omission claims.  Thus, even if the Court agreed with FCA that the economic loss doctrine barred Plaintiffs' fraudulent omission claims under the laws of certain states, other fraudulent omission claims would remain, and discovery would proceed in much the same fashion regardless of how the Court ruled on the economic loss doctrine question.  Simply put, postponing a decision on FCA's economic-loss-doctrine arguments until full briefing at the summary judgment stage will not substantially enlarge or impact the scope of discovery or the course of proceedings, and that fact further convinces the Court to delay decision on the economic-loss-doctrine questions.

**c**

Next, FCA argues that Plaintiffs fail "to plead facts sufficient to establish any duty of disclosure under the laws of Pennsylvania, South Carolina, or Texas."[8] (Mot. to Dismiss, ECF No. 16, PageID.1009.)  The Court disagrees.

Under the laws of each of these states, "[t]he cases on point have held … [that] where the plaintiffs plausibly alleged that the … defect [] implicates vehicle safety," the defendant had a duty to disclose the defect. *Francis*, 504 F.Supp.3d at 685-86 (citing cases applying Pennsylvania and South Carolina law); *In re Takata Airbag Products Liability Litigation*, 2016 WL 5848843, at *7 (S.D. Fla. Sept. 21, 2016) ("The Court also concludes that Plaintiffs have adequately alleged that Toyota had a duty to disclose information about the Takata airbags under South Carolina law"); *In re Volkswagen Timing Chain Product Liability Litigation*, 2017 WL 1902160, at *20 ("Defendant had a duty to disclose the safety defect under …South Carolina[] and Texas law and Plaintiffs claims pursuant to this theory of liability will not be dismissed").  And here, for all of the reasons stated above, the Plaintiffs plausibly allege that the Transmission Defect "implicates vehicle safety."  The Court therefore declines to dismiss Plaintiffs' fraudulent omission claims on the theory that FCA did not have a duty to disclose the Transmission Defect.

---

[8] *See* Counts IV, VII, VIII, XLV, L, LII, and LV of the First Amended Complaint.

**E**

FCA next challenges several state-specific claims brought by various Plaintiffs. The Court will address these claims on an individual basis.

**1**

FCA first argues that Plaintiff Shreve's claim under the Arizona Consumer Fraud Act[9] (the "ACFA") is time barred. (*See* Mot. to Dismiss, ECF No. 16, PageID.1010.) That argument is, in its entirety, five sentences long:

> Shreve's claim under the ACFA is untimely. Under Arizona law, any claim under that statute must be filed within one year after the cause of action accrues, and this occurs as soon as the product is "not performing as expected." *Cheatham v. ADT Corp.*, 161 F.Supp.3d 815, 826 (D.Ariz. 2016) (quotation omitted). Shreve purchased his vehicle in 2017, and alleges that it "began to buck and stall" within a month after purchase. See Comp., ¶¶ 41, 47-51 (ECF No. 14, PageID.592-95). *Yet*, he did not file his claim until 2020. His claim is thus time-barred and should be dismissed. See, *e.g., Schechner*, 237 F.Supp.3d at 621.

(*Id.*)

The Court is not yet able to conclude as a matter of law that Shreve's claim is time-barred. Shreve says that he took his vehicle in for a repair, and his allegations suggest that there may be some uncertainty about how effective the repair was. Moreover, it is not clear when Shreve became aware that his vehicle continued to suffer from the Transmission Defect after the repair. The Court concludes that

---

[9] *See* Count X of the First Amended Complaint.

FCA's limitations defense to Shreve's claim under the ACFA is most appropriately addressed at summary judgment.

## 2

FCA next argues that Plaintiff Landgrebe's claim under the Minnesota Uniform Deceptive Trade Practices Act (the "MUDTPA")[10] is limited to injunctive relief, and it insists that she fails "to plead any viable claim" for such relief. (Mot. to Dismiss, ECF No. 16, PageID.1010.) More specifically, FCA says that in order to be entitled to an injunction, Landgrebe would "need to allege facts showing that she is 'likely to be damaged in the future' by the alleged misrepresentations and omissions, *i.e.*, that she is likely to again be misled by FCA['s] allegedly deceptive advertising." (*Id.*) The Court disagrees.

Simply put, Landgrebe plausibly alleges that she continues to suffer harm from the Transmission Defect because FCA has refused to repair the defect. Indeed, Landgrebe alleges that "[d]espite providing FCA and its authorized dealer with more than one opportunity to repair her vehicle, [she] continued to experience the Transmission Defect, including, but not limited to, harsh shifting, lunging when coming to a complete stop, and failing to accelerate when the accelerator pedal is depressed." (Am. Compl. at ¶121, ECF No. 14, PageID.610-611.) And, it is possible that following trial, Landgrebe could obtain an injunction requiring FCA to repair

---

[10] *See* Count XXXI of the First Amended Complaint.

her vehicle.  Accordingly, it would be premature to dismiss Landgrebe's MUDTPA claim at this time.

**3**

Next, FCA asserts that Plaintiffs' Virginia Consumer Protection Act (the "VCPA") claim[11]  must be dismissed "to the extent [that] it is pursued on behalf of a class" because "[t]he VCPA, by its plain terms, does not permit class actions." (Mot. to Dismiss, ECF No. 16, PageID.1011.)  The Court again disagrees.

FCA is correct that "Virginia does not generally allow class actions, unless specifically permitted by statute, and the VCPA does not explicitly permit class actions." *In re Hardieplank Fiber Cement Siding Litigation*, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013).  But that does not end the Court's inquiry because Federal Rule of Civil Procedure 23 "unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met." *Fishon v. Mars Petcare US, Inc.*, 501 F.Supp.3d 555, 574 (M.D. Tenn. 2020) (emphasis in original).  Thus, "[t]he question is whether [Virginia's bar on class actions] survive[s] Federal Rule of Civil Procedure 23." *In re Myford Touch Consumer Litigation*, 2016 WL 7734558, at *26 (N.D. Cal. Sept. 14, 2016).

This Court joins the other federal district courts that have answered that question "no" and that have allowed plaintiffs to pursue class claims under the

---

[11] *See* Count LVII of the First Amended Complaint.

32

VCPA. *See id.* (holding that "[b]ecause Virginia's class action ban is not part of the VCPA, and applies outside the context of the VCPA, it is procedural rather than substantive, and is precluded by Rule 23. Virginia's ban on class actions therefore does not apply here"); *Fishon v. Mars Petcare US, Inc.*, 501 F.Supp.3d at 574-575 (denying motion to dismiss class action claim under VCPA and holding that the VPCA was "preempted [by Rule 23] and cannot apply in this federal case"); *In re Hardieplank Fiber Cement Siding Litigation*, 2013 WL 3717743, at *17 (holding that Rule 23 "governe[d] the availability of a class action under the VCPA," denying motion to dismiss class allegations under the VCPA, and explaining that Virginia's bar on class actions did not control because "[t]he absence of a class action right under the VCPA is the 'default' position under Virginia law, rather than a provision of the VCPA itself. Thus, Court concludes that the lack of a class action mechanism is a procedural matter, rather than a substantive law defining the types of rights and remedies available under the VCPA itself").

For all of these reasons explained in *Myford Touch*, *Fishon*, and *Hardieplank*, the Court declines to dismiss Plaintiffs' VCPA claim to the extent that it is pursued on behalf of a class.

## 4

Finally with respect to Plaintiffs' state-specific claims, FCA argues that the Court must dismiss Plaintiffs' claims under New York General Business Laws

("NYGBL") Sections 349 and 350[12] because Plaintiffs "do not allege any injury that is different than what is alleged to support their breach of warranty claims. (Mot. to Dismiss, ECF No. 16, PageID.1011.)  And FCA says that under New York law, the lack of any injury beyond a contractual one" requires dismissal. (*Id.*) The Court disagrees.   Indeed, "numerous courts have permitted plaintiffs to bring misrepresentation-by-omission claims [under Sections 349 and 350] against vehicle manufacturers based on the manufacturer's failure to disclose product defects at the point-of-sale." *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *9 (E.D.N.Y. Sept. 30, 2015) (denying motion to dismiss failure-to-disclose claim under Section 349 where automaker failed to disclose car defect).

FCA counters that Plaintiffs do not plead viable injuries under Sections 349 and 350.  The Court disagrees.  "A plaintiff who alleges that a deceptive practice caused him to pay more than the good or service he actually received was worth may be able to satisfy the injury requirement." *Kommer v Ford Motor Co.*, 2017 WL 3251598, at *5 (N.D.N.Y. July 28, 2017).  That is what Plaintiffs allege here. Moreover, FCA has not repaired Plaintiffs' vehicles, and that too weighs in favor of finding the existence of a "cognizable injury" under Sections 349 and 350. *Id.* (explaining that "if Ford was unable to fix the [alleged] defect, then [plaintiff] may have suffered a cognizable injury under N.Y. G.B.L sections 349 and 350").

---

[12] *See* Counts XXXVI and XXXVII of the First Amended Complaint.

For all of these reasons, the Court declines to dismiss Plaintiffs' Section 349 and 350 claims based on FCA's fraudulent omissions.

**F**

The Court now turns to FCA's argument that Plaintiffs cannot state viable unjust enrichment claims[13] because "no unjust enrichment claim is legally viable where, as here, an express warranty exists which defines the parties' rights and expectations." (Mot. to Dismiss, ECF No, 16, PageID.1012.)  The Court agrees.  As it recently explained when rejecting similar unjust enrichment claims brought by a group of vehicle owners against the manufacturer of their vehicles, a plaintiff cannot maintain an unjust enrichment claim where there is an express warranty that governs the same subject matter as their unjust enrichment claims:

> Plaintiffs' unjust enrichment claim is not cognizable because there is an express contract that covers the same subject matter – namely, the express limited warranty that GM provided at the time the Class Vehicles were first purchased.  "Courts will not imply a contract" for the purposes of an unjust enrichment claim "where there is an express contract governing the same subject matter." *GM Air Conditioning*, 406 F. Supp. 3d at 634 (emphasis removed) (dismissing unjust enrichment claim). *See also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties"); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151,

---

[13] *See* Counts IX, XIII, XVIII, XXIII, XXIX, XXXV, XLI, XLVI, LI, LVI, and LXI of the First Amended Complaint.

1167 (9th Cir. 1996) ("Under [] California ... law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties."). Indeed, courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims. *See*, *e.g.*, *McKee*, 376 F. Supp. 3d at 762 ("Because the [w]arranty governs [p]laintiff's claims against GM for the Transmission Defect, a claim for unjust enrichment is unavailable to him."); *Mitchell v. Gen. Motors, LLC*, 2014 WL 1319519, at *15 (W.D. Ky. Mar. 31, 2014) (granting GM's motion to dismiss unjust enrichment claim where "the written [w]arranty is an explicit contract that governs their relationship"); *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *15 (E.D. Mich. June 7, 2018) (holding that plaintiffs' "unjust enrichment claims … fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms"). Thus, because the express limited warranty governs the same subject matter as Plaintiffs' unjust enrichment claim, that claim fails. *See GM Air Conditioning*, 406 F. Supp. 3d at 635.

*Hall v. General Motors, LLC*, 2020 WL 1285636, at *10 (E.D. Mich. Mar. 18, 2020) (internal footnote omitted). *See also In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d at 634 ("Plaintiffs cannot maintain their unjust enrichment claim here because there is an express contract governing the same subject matter as that claim – the express Limited Warranty").

Plaintiffs counter – like the plaintiffs in *Hall* – that "Rule 8(d) permits pleading in the alternative, particularly at this stage." (Resp. to Mot. to Dismiss, ECF

No. 20, PageID.1601.)  And they insist that this case is unlike *Hall* because "FCA clearly disputes whether an express warranty governs the subject matter of Plaintiffs' claims." (*Id.*)

But here, there is no dispute that the express warranty exists and that it governs the subject matter of which repairs FCA has agreed to perform.  What the parties disagree about is whether the precise Transmission Defect at issue is one of the defects that FCA has agreed to repair.  This is therefore not a case where FCA denies that an express warranty exists or that it is bound by the terms of that warranty.  Thus, as in *Hall*, because there is a contract that covers the same subject matter of this dispute (*i.e.*, what kind of defects FCA will agree to repair), Plaintiffs may not maintain an unjust enrichment claim as an alternative to their breach of express warranty claims. *See Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at ** 20-21 (dismissing unjust enrichment claims where express warranty "governe[d] the parties' relationship and [defendant's] duties to remedy defects" and where "[t]he dispute [was] over what types of defect [the defendant was] required to repair or replace under the warranty"). Accordingly, the Court will dismiss Plaintiffs' unjust enrichment claims.

## G

FCA next argues that the Court should dismiss certain allegations that Plaintiffs make on behalf of a nationwide class because the Plaintiffs "lack standing

to bring claims on behalf of a nationwide class." (Mot. to Dismiss, ECF No. 16, PageID.1013.) This argument, in *toto*, is four sentences long:

> In the event that this Court does not dismiss the Consolidated Complaint in its entirety, it should nevertheless dismiss the nationwide class allegations. Plaintiffs assert claims on behalf of this class for violation of the MMWA (Count I), breach of implied warranty (Count II), and "Fraud by Omission or Fraudulent Concealment" (Count III). *See* Comp., ¶¶ 283-330 (ECF No. 14, PageID.663-72). But, Plaintiffs do not even attempt to plead such claims under the laws of each of the 50 states. *See, generally*, Comp. Therefore, they "lack[] standing to bring claims on behalf of a nationwide class," and those claims must be dismissed. *McKee*, 376 F.Supp.3d at 755-56; *see also Wozniak*, 2019 WL 108845, at *1; *In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 657 (E.D.Mich. 2011).

(*Id.*)

However, this abbreviated argument does not account for the fact that, in the first instance, Plaintiffs bring their nationwide claims under Michigan law, and that they only invoke the "laws of each of the 50 states" as an alternative basis for their claims. (*See*, *e.g.*, Am. Compl. at Counts II and III.) Because FCA has not addressed these claims in the manner that they are pleaded in the Amended Complaint, the Court declines to dismiss the nationwide claims on the grounds advanced by FCA.

Under these circumstances, the Court will address the propriety of the nationwide claims during class certification.[14]

## H

Finally, FCA asks the Court to dismiss Plaintiffs' demand for a voluntary recall as a potential remedy. (*See* Mot. to Dismiss, ECF No. 16, PageID.1013-1014.) That request is premature.  If Plaintiffs succeed on any of their claims – a question that likely will not be resolved for a significant period of time – the Court will entertain arguments from the parties about whether an order compelling FCA to recall and/or repair the affected Class Vehicles is an appropriate or allowable remedy.  The Court declines to address that issue now at this early stage of the proceedings. *See Bossart v. General Motors, LLC*, E.D. Mich. Case No. 20-cv-11057, at ECF No. 32, PageID.1990-1991 (declining to dismiss Plaintiffs' request for recall and concluding that "[a]t this early stage in the litigation … defendant's instant challenge regarding remedies is premature"); *Marsikian v. Mercedez Benz USA, LLC*, 2009 WL 8379784, at *8 (C.D. Cal. May 4, 2009) (noting that at the motion to dismiss stage, "Defendant's request to bar a recall is premature").

---

[14] FCA does not contend that the named Plaintiffs lack Article III standing to bring the claims raised in the Amended Complaint on their own behalf.

**V**

For all of the reasons explained above, FCA's motion to dismiss (ECF No. 16) is **GRANTED IN PART AND DENIED IN PART**.

The motion is **GRANTED** with respect to:

- Plaintiffs' implied warranty claim under Connecticut law (Count XV of the Amended Complaint);

- Plaintiffs fraud and state consumer protection act claims to the extent that those claims are based on FCA's alleged affirmative misrepresentations *only* (Counts III, IV, VII, VIII, X, XI, XII, XIV, XVII, XIX, XXII, XXIV, XXVIII, XXX, XXXI, XXXIV, XXXVI, XXXVII, XL, XLII, XLV, XLVII, L, LII, LVII, and LX of the Amended Complaint). The claims are not dismissed to the extent that they are based on alleged fraudulent omissions; and

- Plaintiffs' unjust enrichment claims (Counts IX, XIII, XVIII, XXIII, XXIX, XXXV, XLI, XLVI, LI, LVI, and LXI of the Amended Complaint).

The motion is **DENIED** in all other respects.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: July 26, 2021           UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 26, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764